[Crim. Nos. 3760, 3761. Fourth Dist., Div. One. Apr. 28, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
ERNEST RALPH VILLARINO, Defendant and Appellant.

**COUNSEL**

Louis C. Novak, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jimmie T. Tinsley, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**WHELAN, J.**—This is a consolidation of two appeals by Ernest Ralph Villarino (defendant). The appeal in No. 3761 is from a judgment imposing sentence following the revocation of probation in an offense involving narcotics. That appeal was taken because probation was revoked following defendant's conviction of forgery in the case in which appeal No. 3760 was taken. For that reason the appeal in No. 3760 will first be discussed.

### APPEAL IN CASE NO. 3760

Defendant was charged in three counts and convicted of having forged the name of L. E. Eubanks, Jr., in the endorsing of three checks cashed respectively by Geno Ferrante, Gene Spurgeon and James Young; the first two on May 19, 1966, and the third on May 18, 1966.

The check cashed by Ferrante was endorsed in his presence by defendant. As identification, defendant had displayed a California driver's license issued in the name of Eubanks, the number of which Ferrante noted on the back of the check.

The other two checks had been tendered by a woman. In each case the woman endorsed the check "Mrs. L. E. Eubanks." The woman for whom

Young cashed the check displayed as identification an Illinois driver's license in the name of Eubanks. Young saw the woman leave the store of which he was manager and get into a yellow Thunderbird car, whose license number (HZX 855) he wrote on the back of the check. A black-haired man had been in the car behind the steering wheel.

As a part of the prosecution's case, Gary Johnson testified that on a certain day he had cashed a check made payable to L. E. Eubanks, Jr., (Johnson check). It had been presented to him the day before by a woman and it bore the endorsement "L. E. Eubanks"; the woman also endorsed it in Johnson's presence, but he told her he did not have money enough on hand to cash the check. The woman returned the next day and presented the same check, when Johnson cashed it for her. Johnson observed on both days that the woman was pregnant.

Another check, payable to and bearing the endorsement "E. R. Mendez" and dated May 6, 1966, was cashed in a market. The endorsement "E. R. Mendez" was by the same hand that placed the first endorsement on the other checks mentioned.

Yet another check was presented by a man on May 18, 1966, to Margaret Nash, who called the drawee bank and was told the check was a stolen check. She then called the police station, but when she had done so the man had left and was seen to get into a 1958 yellow Thunderbird. The check bore the endorsement "L. E. Eubanks" by the same hand that had placed a like endorsement on the other checks mentioned. The first endorser on all the checks had placed a Reed Street address after the endorsements.

Logan Richard Eubanks, Jr., was a member of the U. S. Navy. In September of 1965 he lost and never recovered a wallet containing his California vehicle operator's license and a similar license issued to him by the state of Illinois. The number of his California license was that taken by Ferrante from the license produced by defendant; the number of his Illinois license was that taken by Young from the license displayed to him when he cashed the check for the woman.

Eubanks had not endorsed any of the checks in question, was not and had never been married, and had never been employed by H. B. Wolff Construction Company, against whose account the checks purportedly were drawn.

From December 1965 until August 1966 defendant was employed by Aeroquip Corporation Robot Plant, of which Harry Foster was manager. Defendant had had issued to him an identification card on which Foster's signature, "H. Foster," appeared. Foster had not made any of the signa-

tures "H. Foster" that appeared on the face of the checks. Those signatures, in the opinion of a handwriting expert, had been copied from a genuine signature "H. Foster" such as appeared on defendant's identification card.

There was expert testimony that the endorsements "L. E. Eubanks" on the checks cashed by Ferrante, Spurgeon and Young were all by the same hand. The second endorsements, "Mrs. L. E. Eubanks," on the checks cashed by Spurgeon and Young were made by one person, but by a different person from the maker of the first endorsements.

Caroline Villarino was subpoenaed by the People. After having been sworn as a witness, she testified that she was the wife of defendant. Defendant then raised the claim of marital privilege, which was allowed and the witness was excused. The sole purpose of the prosecution in calling her was to have her identify herself as defendant's wife.

Another witness testified that defendant's wife had given birth to a child some four months before the trial, which was in November 1966.

After defendant's wife appeared on the witness stand, Johnson identified her as the woman for whom he had cashed the check.

A 1958 Thunderbird, license No. HZX 855, was registered in the name of defendant and his wife.

The handwriting expert gave his opinion that the endorsement "L. E. Eubanks" on all the checks presented for cashing had been made by defendant, based upon comparisons of the endorsements with known exemplars of defendant's handwriting and signature. The name "H. Foster" on the face of the checks might have been written by the same hand. All appeared to have been written by a left-handed penman.

### DEFENSE WITNESSES

Testimony on behalf of defendant was that of his wife and his sister-in-law.

The testimony of the sister-in-law suggested the possibility defendant's Thunderbird car might have been away from San Diego on May 18 and 19.

Defendant's wife testified she had found the Eubanks wallet and contents; she had also found the blank check forms that were used and had filled in the face of the checks and had signed the name "H. Foster" thereon; in February 1966 she had met a man named "Gary," last name unknown, through a friend named "Frank," last name unknown; the exact residence address of each was also unknown; Gary had made the first endorsement "L. E. Eubanks, Jr." on the checks that bore that endorsement and the endorsement "E. R. Mendez" and he had cashed

some of the checks, using one of the Eubank's drivers' licenses which she gave to him. Mrs. Villarino was shown a check dated June 3, 1966, made payable to L. E. Eubanks, Jr., signed "H. Foster" and bearing an endorsement "L. E. Eubanks, Jr." with a Reed Street address. That, also, she said, had been endorsed and cashed by Gary.

She had cashed the checks that bore the second endorsement "Mrs. L. E. Eubanks."

She was recalled for further cross-examination as to an impeaching statement after the district attorney had once said he had no further questions; and was asked about the prior impeaching statement; she was also asked by the district attorney to sign her own name, the name "Mrs. L. E. Eubanks," and the name "H. Foster" twice, which she did, spelling "Foster" as "Forster."

### REBUTTAL

In rebuttal, the handwriting expert stated the endorsement "L. E. Eubanks, Jr." and the street address thereunder on the June 3 check clearly were written by a different person than the endorsements on the other six checks. So, also, it appears to us.

He testified further, based upon his examination of the handwriting specimens given in court by Mrs. Villarino, that she had not written the signature "H. Foster" on any of the checks.

Defendant's sister-in-law testified that Mrs. Villarino, on the day she testified and before testifying, had told the witness: ". . . she was going to take all the blame for Ernie because she couldn't be without him for any length of time."

### CONTENTIONS ON APPEAL

Defendant's contentions may be summarized as follows:

The district attorney was guilty of prejudicial misconduct in calling defendant's wife as a witness after defense counsel had made it known that defendant would not waive his privilege against her testifying.

Because of that prejudicial misconduct, as a result of which defendant's wife was identified as the woman for whom Johnson had cashed the check, defense counsel had no choice but to call her as a witness in the hope of establishing a defense.

It was error to permit defendant's wife to be asked, over objection, to give samples of her handwriting; and it was error, also, to permit the

handwriting expert to use such exemplars, given during the course of trial, for purposes of comparison.

### ALLEGED MISCONDUCT OF THE DISTRICT ATTORNEY

 Defense counsel, out of the presence of the jury, informed the court that Mrs. Villarino had been subpoenaed by the prosecution, that defendant intended to exercise the marital privilege;[1] counsel sought a ruling the wife need not respond to the subpoena. The district attorney stated it was not his intention to have Mrs. Villarino do anything more than produce herself as physical evidence and to state whether she was defendant's wife.

The court ruled the witness should appear, and that the privilege should be asserted after she had been sworn.

Defendant cites *People* v. *Solis,* 193 Cal.App.2d 68 [13 Cal.Rptr. 813], in which it was held reversible misconduct for the district attorney to call the defendant's wife as a witness in the face of a prior warning there would be an objection. The court in *Solis* said: "[I]n the case now before this court the People knew in advance that such procedure would serve no purpose except unfairly to prejudice the appellant. Justice does not consist of the mechanical application of rules of procedure without regard to the circumstances of the particular case. . . . In the present case, the conduct of the deputy district attorney cannot be justified by any argument to the effect that the People had to call Mrs. Solis to determine whether she was in fact the wife of the appellant or whether the privilege would be claimed by the appellant; the record clearly shows that the People assumed her to be married to the appellant when she was called as a witness." [Pp. 77-78] To the same effect was *People* v. *Gill,* 143 Cal.App.2d 46 [299 P.2d 682].

We must assume that the district attorney when he subpoenaed the wife was aware that Johnson would identify her as the woman for whom he had cashed the check. Johnson could not of course have testified that the woman was Mrs. Villarino because he had not known her as such. Her physical presence in the courtroom was the most direct and simple manner of proving, for what it was worth, that defendant's wife was the woman in question. Actually, it was the fact of the close association with defendant that was the ultimate matter to be proved rather than the relationship out of which the association grew.

Concerning the claim of privilege against self-incrimination as applied to the viewing of the bodily features of a defendant charged with a crime,

---

[1]Under Evidence Code section 971, effective January 1, 1967, the privilege not to testify is that of the spouse-witness rather than the spouse-party, whose privilege (§ 980) is to prevent disclosure of a marital communication.

Professor Wigmore made these observations: "If an accused person were to refuse to be removed from the jail to the courtroom for trial, claiming that he was privileged not to expose his features to the witnesses for identification, it is not difficult to conceive the judicial reception which would be given to such a claim. And yet no less a claim is the logical consequence of the argument that has been frequently offered and occasionally sanctioned in applying the privilege to proof of the bodily features of the accused.

"The limit of the privilege should be plain. From the general principle (§ 2263 *supra*) it results that an inspection of the bodily features by the tribunal or by witnesses does not violate the privilege because it does not call upon the accused as a witness—i.e., upon his testimonial responsibility." (8 Wigmore, Evidence, 3d ed., § 2265, p. 386.)

As to a non-party witness, his duty in part has been described as follows: "Apart from specific privileges, . . . (§§ 2210-2224 *infra*), a person is bound, if required, to furnish evidence by submitting his *corporal features,* his *chattels* and his *premises* to the inspection of the tribunal . . ." (8 Wigmore, *supra,* § 2194, p. 76.)

The question arises whether the means employed was proper to compel the witness to bring herself to court to be seen. No statutory or judicial authority has been cited. However, the question has been considered. Professor Wigmore had this to say on the subject: "Apart from any one of the specific privileges already examined, is there ground for claiming a privilege to decline testimonial disclosure in any form other than that of speaking words or producing documents?

"The answer must be in the negative.

"Nevertheless, courts have occasionally entertained a doubt, in this respect, of the same unfounded nature as that which was once raised for the production of documents (§ 2200 *supra*)—that is, a doubt as to the existence of *appropriate process* to compel this sort of testimony. Upon this ground such a compulsion has sometimes been refused. But must there be a precise precedent for everything? Nobody has been able to find any definite authority for the 'duces tecum' form of subpoena (§ 2193 *supra*); nor was there any known precedent of a writ 'habeas corpus ad testificandum' (§ 2199 *supra*). The courts have inherent power to command a witness to let the jury, or qualified experts, inspect his premises, his chattels or his person, as well as to produce his documents.

" . . . . . . . . . . . . . . . . .

"(c) As to a witness' living *body,* whether by self-exhibition to the jury at the trial or by inspection of experts out of court, there is ample

authority denying any privilege of nondisclosure, the trial court's discretion determining the necessity and the suitable conditions." (8 Wigmore, *supra*, § 2216, p. 166.)

Two out-of-state decisions have dealt with the subject as related to the marital privilege.

In *Edwards* v. *State*, 71 Tex. Crim. Rep. 417 [160 S.W. 709-710], the defendant was being tried for perjury in that in a divorce action he had falsely testified to the bodily condition of his wife. She was examined by a physician who testified over objection as to what he had observed. Concerning the objection, the Court of Criminal Appeals said: "The contention that, because Mrs. Edwards was appellant's wife, the doctor . . . would not be permitted to testify as to her condition in the respects named—that this would be permitting the wife to testify against the husband—cannot be sustained. It is true that Mrs. Edwards could not and was not permitted to testify; the law closed her mouth. Then to further hold that she was not permitted to submit her person to examination, and the persons making the examination not permitted to testify, would be monstrous."

In *State* v. *Winnett*, 48 Wash. 93 [92 P. 904], an earlier case, the Supreme Court of Washington took a contrary view. The defendant was charged with statutory rape of a girl under 18 years of age, whom he married before trial. The wife was called into the courtroom where it could be observed she was advanced in pregnancy. That was while a doctor who had examined her earlier that day was testifying as to the examination and that she was pregnant in his opinion for about six months. Said the court: "It is contended by the appellant that, notwithstanding the fact that the law will not permit the wife to testify against him without his consent, by this pretense she was actually made an exhibit for the state. We think the appellant has just ground for complaint in this respect. The wife was in reality a witness against him by being brought in sight of the jury where her condition as to pregnancy, which was a fact which the state sought to prove, could be observed and noted by the jury. This might have been evidence of the most convincing and telling character, and being produced before the jury, just after the testimony of Dr. Van Patten in relation to her pregenancy, and the possible length of time which she had been in that condition—presumably six months—it would not be slanderous to impute to the jurors a careful scrutiny of the witness with a view of determining for themselves the probable correctness of the doctor's diagnosis. The result was that, while the wife could not testify as to her condition, by this subterfuge she actually did testify in a manner more convincing than mere words would have been. . . . It does not seem

that it was at all necessary to parade her in the courtroom for the purpose suggested. The doctor could have testified that he knew Bessie Winnett, the wife of the appellant, and that it was she whom he had examined, just as such identifications are ordinarily made. The whole record shows that the proceeding was rather theatrical, and as such had no proper place in a court of justice." [P. 905] Since the court found no fault with the doctor's giving evidence as to his observations, it is likely that the court's real concern was the embarrassment caused to the wife.

Another basis for the Washington decision is perhaps found in the language of *People* v. *Curiale,* 137 Cal. 534, 539 [70 P. 468]: "[I]t is not apparent to us that it would be any great injustice to forbid the woman who marries a man freely, and lives with him as his wife, from testifying that he had sexual intercourse with her before she was sixteen years old and prior to her marriage. The act was with her consent. She knew it when she gave to him her vow to be his good and lawful wife."

■ The claim of privilege can be sustained only upon proof of the marital relationship. (*People* v. *McIntyre,* 213 Cal. 50, 55 [1 P.2d 443].)

■ It is doubtful that merely asking the witness if she was the wife of defendant violated the privilege. In *People* v. *Fultz,* 109 Cal. 258, 263 [41 P. 1040], the wife was asked if she were the wife and where she had resided on a certain date. In discussing whether the privilege was violated, the court said: "It is insisted by counsel for appellant that the court erred in permitting the defendant to be asked whether he consented that his wife should testify; and also in permitting her to testify to the extent she did as to the place of her residence at the alleged time of the commission of the act charged, for the reason that such testimony corroborated and strengthened that of her daughter as to the alleged time and place of the commission of the crime. But the testimony of the defendant also corroborated that of the daughter, not only as to time and place, but as to many other much more material circumstances. There was no question or dispute as to the time or place. Further than this, I think that the bare statement of the questions under this head is a sufficient refutation of plaintiff's contention." In that case, the statement by the witness of her identity was not advanced by the defendant as being in violation of the privilege. (See also *Dean* v. *Superior Court,* 103 Cal.App.2d 892, 893 [230 P.2d 362].)

In the present case, the conduct of the district attorney was not that condemned in *People* v. *Wilkes,* 44 Cal.2d 679, 687 [284 P.2d 481]. He represented to the court that he did not intend to question the wife further than to establish her identity; if so, it may be that the questioning would

have been terminated without its being necessary for defendant to assert the privilege before the jury.

### The Claim the Wife Testified Only Because of the District Attorney's Tactic

It is unlikely that the contention has a basis in fact. Defendant had been identified as the endorser of one of the checks by the man who saw him do it; his car had been identified by license number and description as the car in which the woman for whom Young cashed a check had left the parking lot; defendant's handwriting had been identified as that of the endorser of several of the forged checks. Proof of the fact that defendant's wife had presented the check to Johnson was not alone a factor of sufficient importance to compel her to become a witness for the purpose of patently committing perjury. Her motive for doing that was probably truthfully stated to defendant's sister-in-law.

A testimonial confession by a defendant has sometimes been the result of the erroneous admission of an extrajudicial confession unlawfully obtained. Such a course of events is clearly damaging to a defendant. In the situation with which we deal, defendant was to have been benefitted rather than otherwise by his wife's testimony. She, rather than he, was damaged by her admissions of a complicity far wider than that indicated by Johnson's identification of her.

The information in the forgery action was not filed until September 6, 1966. In the intervening period following the specific forgeries charged, it is likely that Mrs. Villarino's possible involvement was the subject of investigation, and that her identification as defendant's wife was a matter susceptible of proof by other means than that actually employed in the trial. We are unable to see that any right of defendant was denied by that method of proof. If such a right had been affected, it is nevertheless true that the wife's taking the stand as a defense witness was not the result thereof, and did not cause damage to defendant.

### It Was Not Error to Permit the Use of Handwriting Exemplars Made by Mrs. Villarino in Cross-examination

██ As a part of her cross-examination, Mrs. Villarino, over objection by defendant, was asked to and did sign her own name and the names of H. Foster and Mrs. L. E. Eubanks. She had on direct examination testified she had placed the name H. Foster on the forged checks.

██ On cross-examination of a witness who has testified to placing a signature on a questioned document, it is proper to have the witness

write the same name and to give other samples of handwriting for comparison with the signature testified to.

In such a situation, the rule that "One who disputes a signature claimed to be his own may not write his name in the presence of the jury and offer it to them as a standard of comparison" (29 Am. Jur. 2d § 811, p. 904; 7 Wigmore on Evidence (3d ed.) § 2018, pp. 227-228; *People* v. *Briggs,* 117 Cal.App. 708 [4 P.2d 593]; *People* v. *Sauer,* 163 Cal.App.2d 740, 746 [329 P.2d 962]; *Gulzoni* v. *Tyler,* 64 Cal. 334, 336 [30 P.2d 981]) does not apply.

The rationale of the latter rule is set out in *People* v. *Golembiewski,* 25 Cal.App.2d 115, 119 [76 P.2d 717]: " ' "[I]t would open too wide the door for fraud, if a witness were allowed to corroborate his own testimony by the preparation of specimens of his writing for the purpose of comparison. By design a correspondence with, or departure from the disputed writing could be fabricated; and whether there was such design, is an enquiry with which the jury should not be embarrassed." ' "

Professor Wigmore states the guiding principle to be whether the specimen is a fair one. (7 Wigmore on Evidence, *supra,* § 2009, p. 206.)

In other circumstances, the rule is that: "[S]pecimens may be made in court in the view of the court or jury for the express purpose of comparison. Thus, a witness may be directed in cross-examination to write in open court, in order that the jury may compare such writing with the controverted signature." (29 Am.Jur.2d 904.) (See also *State* v. *Stephens,* 168 Kan. 5 [209 P.2d 924].)

█ Where the witness being cross-examined has denied that certain handwriting is his, the cross-examiner normally should be permitted to obtain exemplars from the witness. "[W]here the *opponent* chooses to demand and offer such a specimen; he is the one who suffers by any unfairness, and if he chooses to take the risk, certainly the other party cannot object." (7 Wigmore on Evidence, *supra,* § 2018, p. 228.) (See also *First Galesburg Nat. Bank & Trust Co.* v. *Federal Reserve Bank,* 295 Ill.App. 524 [15 N.E.2d 337, 342-343]; *Mann* v. *State,* 33 Ala.App. 115 [30 So.2d 462, 464].)

█ The court may regulate the order of proof, and it was not an abuse of discretion to permit the handwriting exemplars to be made in a reopening of the cross-examination.

The judgment from which appeal was taken in case No. 3760 is affirmed.

## The Appeal in Case No. 3761

The only ground urged for reversal is that defendant's probation should not have been revoked if he was wrongfully convicted of the forgery charges.

Since we hold that there was no reversible error in the proceedings leading to defendant's conviction of forgery, the judgment from which appeal was taken in case No. 3761 is affirmed.

Brown (Gerald), P. J., and Ault, J., concurred.