[Crim. No. 3938. Fourth Dist., Div. One. Aug. 31, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD L. HESS et al., Defendants and Appellants.

1072

## COUNSEL

Gilbert E. Newton, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jimmie E. Tinsley, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**AULT, J.**—Appellants Donald L. and Terry Lee Hess, husband and wife, were jointly charged and convicted by jury of five felonies; grand theft as defined in Penal Code section 487, subdivision 1, two counts of forgery (Pen. Code, § 470), and two counts of grand theft as defined in Penal Code section 487, subdivision 3 (horse theft). Mrs. Hess was also charged with four prior forgery convictions, one of which she admitted; the other three were found to be true. Appellants were both sentenced to prison on all five counts, with counts I and II ordered to run consecutively. In addition, Mrs. Hess was fined $5,000. They appeal from the judgments of conviction.

Briefly summarized, and viewed in the light most favorable to the People, the evidence reveals:

(1) Appellants agreed to board two horses, a mare named Stardust and her colt named Golden Boy, Jr., for their owner, Mrs. Lenore K. Thompson. In return they were to receive the use of the mare and the right to breed her and to keep all foals. Mrs. Thompson did not agree to give or sell the horses to appellants.

(2) By presenting two forged bills of sale and a statment of loss to the Arabian Horse Club Registry of America, located in Chicago, Illinois, appellants obtained a duplicate registration certificate for a full-blooded Arabian mare named Ingaia. Ingaia was at all times stabled by her real owner in Iowa; she was worth in excess of $3,000.

(3) Knowingly using the false certificate and fraudulently representing Stardust to be Ingaia, appellants sold Stardust to Mr. and Mrs. Hendrix, who purchased her only because they believed her to be Ingaia and a full-blooded Arabian mare.

(4) Mr. and Mrs. Hendrix agreed to pay appellants $1,000 for the mare; $550 was actually paid by them on account of the agreement.

(5) Stardust was in fact half Arabian and half Welsh pony, worth between $150 and $200.

(6) What happened to Golden Boy, Jr., is not clear, except he was never returned to Mrs. Thompson by appellants.

At trial appellants unconvincingly claimed Mrs. Thompson had given them both horses, represented Stardust to be Ingaia, and furnished them with the forged bills of sale and statement of loss. They also contended they sold the mare in good faith, believing her to be Ingaia. The jury rejected their claims and accepted the contrary evidence elicited by the

People. Appellants do not question the sufficiency of the evidence to support the judgments. On appeal they make the following contentions:

(1) Evidence was improperly admitted to show that Mrs. Hess refused to give a sample of her disguised backhand writing.

(2) Post litem motam handwriting exemplars were improperly admitted in evidence.

(3) Evidence of a phone conversation was admitted without foundation.

(4) The court erred in refusing one of the petty theft instructions.

(5) The court improperly allowed a witness to refresh her memory from a memo written more than a year after the events occurred.

(6) Defendants were denied due process of law and a fair trial by the prejudicial misconduct of the trial judge.

DISCUSSION

I

■ The signatures on the forged bills of sale and claims of loss used to effect the sale of Stardust as Ingaia were written with a backhand slant. Mrs. Hess, among others, gave an exemplar of her handwriting to a district attorney's investigator. Although the exemplar contained a small amount of backhand writing, the People's handwriting expert, while noting many similarities, found it inadequate to make a definitive comparison with the forged documents. Before trial and on motion, the prosecution obtained an order requiring Mrs. Hess to furnish an additional sample of her backhand writing. On advice of counsel, she refused to furnish the sample. Over objection, the prosecution produced evidence of the refusal, and argued it to the jury as raising an inference of guilt.

Appellants concede it would have been proper to require Mrs. Hess to furnish samples of her normal writing or printing. Their objection is to the backhand sample where a backhand slant was not Mrs. Hess' natural writing style. They argue, "It is unfair to compel the accused to write in an unnatural hand, disguised in the same manner as the forged writing, in order to facilitate identification." The contention is not supported by authority. ■ The privilege against self-incrimination is a bar against compelling communication or testimony; it does not prevent compelling the accused from becoming the source of real or physical evidence. *Schmerber* v. *State of California,* 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826, 1832]; ". . . [the privilege] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or

speak for identification, to appear in court, to stand, *to assume a stance, to walk, or to make a particular gesture." (Ibid.;* italics added.) ▓ Assuming a stance, or making a particular gesture, require the suspect to do something artificial or unnatural, yet the court in *Schmerber* indicates such requirements are permissible. In *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926, 1930], the Supreme Court specifically held requiring a defendant to repeat the words uttered by a robber was permissible and did not violate his privilege against self-incrimination. Furthermore, it is clear from the testimony of the handwriting expert, the preparation of a backhand exemplar by Mrs. Hess would not tend to lead to a mistaken identification. Rather it would have facilitated either her identification or her elimination as the author of the forged documents. The order requiring Mrs. Hess to provide a backhand handwriting exemplar was proper and, under the rationale of *People* v. *Ellis,* 65 Cal.2d 529, 536-538 [55 Cal.Rptr. 385, 421 P.2d 393], it was also proper for the People to prove she had refused to comply with the order.

## II

▓ During the defendants' case, Mrs. Hess testified Lenore Thompson told her the mare in question was Ingaia and gave her the two bills of sale and the statement of loss which proved to be forged. Her testimony implied Mrs. Thompson was responsible for the forged documents. In rebuttal the People recalled their handwriting expert. He testified he had compared the forged documents with known samples of Mrs. Thompson's handwriting and found the handwriting on the forged documents was not Mrs. Thompson's. Admittedly the handwriting samples were obtained from Mrs. Thompson after the controversy and litigation began.

▓ As a general rule, a handwriting specimen made for the occasion, and post litem motam, may not be used for comparison purposes, and admission of opinion evidence based upon such comparison to corroborate a witness' testimony is error. (*People* v. *Briggs,* 117 Cal.App. 708, 711-712 [4 P.2d 593]; *People* v. *Golembiewski,* 25 Cal.App.2d 115, 119 [76 P.2d 717]; *People* v. *Sauer,* 163 Cal.App.2d 740, 744-746 [329 P.2d 962]; *People* v. *Villarino,* 7 Cal.App.3d 56, 67 [86 Cal.Rptr. 338].) ▓ However, as appellants concede, the forged handwriting in this case was disguised in a backhand slant. Positive identification or elimination by comparison with the forged documents required exemplars written in backhand. Since none of the persons upon whom suspicion focused (Mrs. Hess, Mr. Hess and Mrs. Thompson) naturally wrote in backhand, obviously no such pre-existing handwriting specimens were available.[1]

---

[1] We note Mrs. Thompson furnished the police authorities with two different handwriting samples. The first sample is written in a normal style. The second, written at

 The rule barring use of post litem motam handwriting specimens is not universally followed. (See *People* v. *Sauer, supra,* 163 Cal.App.2d 740, 745; 29 Am.Jur.2d, Evidence, § 810, pp. 902-903.) It is subject to the exception which permits a cross-examiner to demand and use a handwriting sample obtained in open court. (*People* v. *Villarino, supra,* 7 Cal.App.3d 56, 67.) We think the rule presupposes existing samples, adequate for comparison purposes, will normally be available, and we doubt the rule should be applied where the questioned writing is in a disguised style precluding the pre-existence of samples which will enable an expert to make a definitive analysis. In any event, the evidence of appellants' guilt is overwhelming, and their explanation of what transpired is completely unconvincing. If error occurred in connection with the admissibility of the handwriting testimony, we are convinced no miscarriage of justice occurred. Assuming error, we are precluded from reversing the judgment because of it by article VI, section 13 of the California Constitution. (*People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243].)

### III

 Over defense objection, Larry Robertson, the owner of the genuine Arabian horse Ingaia, was permitted to testify concerning a telephone call he received in the fall of 1966 from a person who identified herself as Terry Lee Hess of Jamul, California. Appellants contend no foundation was laid for the admission of the telephone call because Robertson admitted he had never met Terry Lee Hess, had only the one conversation with her, and could not identify her voice. The contention is without merit.
 The identity of a party to a telephone conversation may be established by circumstantial as well as direct evidence. (*People* v. *Davis,* 210 Cal.App.2d 721, 738 [26 Cal.Rptr. 903]; *People* v. *Goodman,* 159 Cal.App.2d 54, 62 [323 P.2d 536].) "[I]dentity of a party to a telephone conversation may be established by proof of recognition of his voice or by other evidence which satisfactorily indicates identity of the individual." (*People* v. *Nails,* 214 Cal.App.2d 689, 692 [29 Cal.Rptr. 671].) The contents of the telephone conversation itself may be considered in relation to other evidence to establish the identity of the speaker. (*People* v. *Nails, supra,* p. 693; *People* v. *McGaughran,* 197 Cal.App.2d 6, 16 [17 Cal.Rptr. 121].)

 Mr. Robertson testified the person who called asked concerning the horse, Ingaia, and expressed an interest in purchasing her. He told her

or about the time the People demanded and were refused a backhand sample by Mrs. Hess, is obviously an effort to furnish a handwriting sample written with a backhand slant.

he would discuss the matter with his son and write her a letter. He was given the address of Rojo Hombre Ranch, Rural Route #1, Box #111, Jamul, California (the Hess' correct address). He wrote a letter to Mrs. Hess at that address in which he described Ingaia and set a price on her. He signed his name to the letter. He never heard from Mrs. Hess again.

Before Mr. Robertson was called as a witness, Mrs. Thompson had testified Mrs. Hess began to call Stardust Ingaia shortly after she accepted the horse for boarding. Mr. Howland, Secretary of the Arabian Horse Club Registry, had testified Mrs. Hess had corresponded with his organization and had obtained a duplicate registration certificate for the horse, Ingaia. To do so she had given a detailed description of the horse and had presented the Registry with a bill of sale containing the forged signature of Larry Robertson. Mrs. Hendrix had testified the Hesses had represented the horse they purchased to be Ingaia, and Sgt. Schoonover, the handwriting expert, had testified to numerous similarities between Mrs. Hess' writing and that which appeared on the forged documents. We think this evidence, together with the contents of the telephone conversation itself, gives rise to the strong inference Mrs. Hess placed the telephone call to Mr. Robertson. It was sufficient to meet the requirement of foundation, and, in view of her denial, it was a matter for jury determination as to whether she in fact had placed the call. (*People* v. *McGaughran, supra,* 197 Cal.App.2d 6, 16.)

## IV

■ Appellants requested and the trial court refused the following instruction: If you find that the defendant committed the crime of theft, but are unable to agree on whether it was grand theft or petty theft, then you must return a verdict of petty theft only.

It is contended the failure to give the instruction was error. The instruction could apply only to count I of the information, charging a theft of money from Mr. and Mrs. Hendrix. Counts IV and V of the information charging the theft of Stardust and Golden Boy, Jr., are specifically defined as felonies by Penal Code section 487, subdivision 3. Appellants erroneously assert the actual value of Stardust should be offset against the amount of money they obtained from Mr. and Mrs. Hendrix in determining whether the crime committed was grand or petty theft. While the trial court defined grand and petty theft and instructed the jury it should make a determination of the degree of theft in count I, we are of the opinion no instructions concerning petty theft were required under the facts. It is undisputed Mr. and Mrs. Hendrix agreed to pay $1,000, and actually paid $550, to appellants based upon the representation the horse they were buying was the

full-blooded Arabian mare, Ingaia. The representation was false. If the representation was knowingly made, the theft was of $550 and constituted grand theft. If the representation was innocently made, no crime at all was committed. Under no circumstance were appellants entitled to offset the actual value of the spurious animal used to accomplish the fraud against the sum obtained from the victims to reduce the crime to petty theft.[2] (See Pen. Code, § 487; *People* v. *Bryant,* 119 Cal. 595, 597 [51 P. 960]; *Buck* v. *Superior Court,* 232 Cal.App.2d 153, 159 [42 Cal.Rptr. 527, 11 A.L.R.3d 1064]; *People* v. *Parker,* 255 Cal.App.2d 664, 671-672 [63 Cal.Rptr. 413].) It follows no error occurred by reason of the court's refusal to give the requested instruction on the subject of petty theft.

## V

 During her testimony, Mrs. Thompson was allowed to refresh her memory by use of a written memorandum she had prepared a few days before the trial and over a year after some of the events referred to in the memorandum had taken place. In preparing the notes she stated she had started with the date she had acquired Stardust and had tried to reconstruct the pertinent events and dates from memory. Appellants contend it was error to permit the use of the notes, because Evidence Code section 1237, subdivision (1) requires such a writing be "made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory."

Evidence Code section 771, not section 1237, governs the use of a writing to refresh a witness' recollection, whether used by the witness while testifying or prior to trial. Adoption of section 771, effective January 1, 1967, brought about a change in California law.

". . . The strict requirements to assure trustworthiness of *past recorded recollection* . . . were applied in California under former C.C.P. 2047 to writings used merely for refreshing recollection. Thus, the writing had to be made by the witness himself or under his direction; it had to be made when the fact was fresh in his memory; and he had to know that the fact was correctly stated. [Citations.]

". . . Ev. C. 771(a) departs from the former rule by allowing present recollection to be revived by 'a writing,' with no express restrictions on

[2] Even if the rule were to the contrary, it would offer no aid to appellants under the circumstances. Since the jury determined they had stolen Stardust from Mrs. Thompson (count IV), it is apparent they conveyed neither title nor value in the purported sale of the horse to Mr. and Mrs. Hendrix. Nothing subtracted from $550 still leaves $550, and a failure to have given complete petty theft instructions with respect to count I would have been harmless error in any event.

the types of writings or the means used to refresh recollection." (Witkin, Cal. Evidence (2d ed. 1966) § 1168, pp. 1081-1082.)

The Legislative Committee comment to section 771 is to the same effect. It states: "It should be noted that there is no restriction in the Evidence Code on the means that may be used to refresh recollection. Thus, the limitations on the types of writings that may be used as recorded memory under Section 1237 do not limit the types of writings that may be used to refresh recollection under Section 771." The court did not err in permitting the witness to refresh her recollection from notes she had prepared.

## VI

■ Finally, appellants contend they were denied due process of law and a fair trial by the prejudicial misconduct of the trial judge. We will not lengthen this opinion by detailing the various instances of claimed misconduct. We have read and reviewed the entire record of the protracted trial, giving particular attention to those portions of it about which appellants complain. In some of the cited instances, the comments of the trial judge were completely proper and unobjectionable. The greatest criticism we can mount concerning any of his comments is that some could have best been left unsaid. In no case do we believe what was said or done constituted misconduct, or that the instances of claimed misconduct, considered individually or in combination, resulted in appellants not receiving a fair trial. Concerning his comments and remarks, we note the trial judge gave proper cautionary instructions to the jury both during the trial and in the final instruction which came at its close. Our review of the record convinces us appellants were fairly tried and justly convicted.

The judgments of conviction are affirmed.

Coughlin, Acting P. J., and Whelan, J., concurred.

A petition for a rehearing was denied September 11, 1970, and appellants' petition for a hearing by the Supreme Court was denied October 28, 1970.