STATE OF NEBRASKA, APPELLEE, V. ROCHE, INC., DOING BUSINESS AS THE COPY CENTER, A NEBRASKA CORPORATION, APPELLANT.
511 N.W.2d 195

Filed January 4, 1994.   No. A-92-1039.

Patrick T. O'Brien, of Bauer, Galter, O'Brien, Allan & Butler, for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

SIEVERS, Chief Judge, and HANNON and MILLER-LERMAN, Judges.

MILLER-LERMAN, Judge.

Appellant, Roche, Inc., doing business as The Copy Center, a Nebraska corporation, was convicted in a bench trial before the district court for Lancaster County of two counts of theft by deception. The case generally involved allegations that Roche had sold two copy machines on which the meters had been rolled back, thereby deceiving the purchasers with respect to the actual number of copies which had been run on the machines. The trial court found beyond a reasonable doubt that Roche was guilty of theft by deception with regard to property valued at $300 or more but less than $1,000, placing a value of $405 on

count I, in connection with the sale of a used Mita 4055 copy machine to Naber's Consulting & Tax Services, Inc. (Naber's). The court also found Roche guilty of theft by deception on count II with regard to property valued at more than $100 but less than $300, placing a value of $180, in connection with the sale of an allegedly new Mita 2555 copy machine to the Nebraska Pharmacists Association, Inc. (NPA). Both convictions are based on violations of Neb. Rev. Stat. § 28-512(1) (Reissue 1989) and graded as theft offenses pursuant to Neb. Rev. Stat. § 28-518 (Reissue 1989). Count I was a Class IV felony, and count II was a Class I misdemeanor pursuant to § 28-518. After a presentence report was prepared, the court ordered Roche to pay restitution of $405 to Naber's and $180 to the NPA. For the reasons recited below, we affirm the judgment in part, vacate the sentences, and remand the cause with directions.

## ASSIGNMENTS OF ERROR

Roche claims on appeal that the trial court erred because (1) a corporation cannot be liable for theft by deception because a corporation cannot possess the requisite intent and (2) there is insufficient evidence to support the convictions of theft by deception because the testimony is not persuasive and there is no evidence that the victims suffered pecuniary loss.

## SCOPE OF REVIEW AND RELEVANT STATUTES

■ With respect to a question of law, "an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the trial court." *VanDeWalle v. Albion Nat. Bank*, 243 Neb. 496, 499, 500 N.W.2d 566, 569-70 (1993).

■ The Nebraska Supreme Court has held:

In determining whether evidence is sufficient to sustain a conviction in a bench trial, an appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented, which are within a fact finder's province for disposition. A conviction in a bench trial of a criminal case is sustained if the evidence, viewed and construed in the light most favorable to the State, is sufficient to support

that conviction. The trial court's findings have the effect of a verdict and will not be set aside unless clearly erroneous.

*State v. Reichert*, 242 Neb. 33, 35, 492 N.W.2d 874, 876 (1992).

■ Under Nebraska statutes, theft by deception is defined as follows:

A person commits theft if he obtains property of another by deception. A person deceives if he intentionally:

(1) Creates or reinforces a false impression, including false impressions as to law, value, intention, or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise . . . [.]

. . . .

The word deceive does not include falsity as to matters having no pecuniary significance, or statements unlikely to deceive ordinary persons in the group addressed.

§ 28-512.

■ The word "person" is defined in the Criminal Code as "any natural person and where relevant a corporation or an unincorporated association." Neb. Rev. Stat. § 28-109(16) (Reissue 1989).

■ The grading of theft offenses is controlled by § 28-518, which provides in relevant part:

(1) Theft constitutes a Class III felony when the value of the thing involved is over one thousand dollars.

(2) Theft constitutes a Class IV felony when the value of the thing involved is three hundred dollars or more, but not over one thousand dollars. ,

(3) Theft constitutes a Class I misdemeanor when the value of the thing involved is more than one hundred dollars, but less than three hundred dollars.

(4) Theft constitutes a Class II misdemeanor when the value of the thing involved is one hundred dollars or less.

■ Restitution is controlled by Neb. Rev. Stat. § 29-2280 et seq. (Reissue 1989). The pertinent portion of those statutes regarding this case states:

A sentencing court may order the defendant to make restitution for the actual physical injury or property damage or loss sustained by the victim as a direct result of the offense for which the defendant has been convicted. Whenever the court believes that restitution may be a proper sentence or the victim of any offense or the prosecuting attorney requests, the court shall order that the presentence investigation report include documentation regarding the nature and amount of the *actual damages sustained* by the victim.

(Emphasis supplied.) § 29-2280.

## FACTS

Gerald (Jerry) Rock and Sandra Rock are co-owners of Roche, Inc., doing business as The Copy Center. The evidence regarding both counts of theft by deception involved the acts of employees of The Copy Center's Lincoln, Nebraska, branch office.

According to the evidence, on April 4, 1989, a Mita 4055 copier, serial No. 36002506, had a beginning meter reading of 847,752 when it was delivered to Cooper Nuclear Station. On June 21, 1989, that same copier left Cooper Nuclear Station with a meter reading of 870,308. On January 30, 1990, this copier was sold to Naber's. The meter read 375,254. The meter reading appeared on a Copy Center invoice and was prepared and initialed by a Copy Center salesperson, Matt Mueller.

Calvin Krohn, a former service manager at The Copy Center in Lincoln, testified that he rolled back the meter on the machine sold to Naber's. Krohn rolled the meter back from approximately 890,000 to under 400,000, pursuant to directions from T.J. Goltl. Goltl was the location manager at the Lincoln store.

Naber's paid $1,595 for the used Mita 4055 copier. Keith Naber testified that he knew he was purchasing a used machine and that he had been told to expect the machine to have a useful life of 1,000,000 copies. He testified that he was not told that the meter had been rolled back. Naber testified that had he been told the meter had been rolled back, he would have paid less for the machine.

Carol Langdon, office manager of the NPA, testified that in November 1989, Mueller offered to bring a demonstrator copier to the NPA. The NPA was looking for a new copier. A few days after the machine had been delivered by Mueller and one other person, the copier malfunctioned. Langdon called Mueller to report the broken copier, and Mueller and a technician went to the NPA to inspect it. The condition of the machine was such that it had to be taken back to the shop at The Copy Center to be repaired.

On December 15, 1989, the NPA purchased from The Copy Center a new Mita 2555, for which the NPA paid $4,220. During the installation by Mueller and a technician of the "new" Mita 2555, serial No. 36002766, Langdon recognized scratches on the copier identical to scratches on the demo that had been taken away for repairs. When asked if the "new" machine was the demo, Mueller replied, "Definitely not. We wouldn't do that. This is a new machine." Langdon pursued by asking, "Are you sure now?" to which Mueller replied, "Definitely."

The copier received by the NPA had two noticeable scratches about 1 foot apart, one above the other. Langdon was suspicious, so she looked at the meter, which read 16. The demo had had approximately 300 on its meter when it was taken away for repairs.

Timothy Arroyo, a former employee of The Copy Center in Lincoln, testified that he was the individual who had rolled the meter back on the machine sold to the NPA. According to Arroyo, Mueller directed him to roll back the meter so that it could be sent back to the NPA as a new one. Arroyo testified that this copier had had a reading of about 2,000 on its meter, and he rolled it back to zero.

Investigator Curtis Hibdon of the Lincoln Police Department, who investigated the case against Roche, testified that pry marks on the meter housings on the copiers sold to Naber's, the NPA, and another customer not at issue here were consistent with marks left on a sample meter which had been altered.

Brian Thomas, a former copier service technician at The Copy Center, testified that he saw another service technician

there, Brian Shea, roll back a copier meter in 1988. He also testified that he heard Jerry Rock tell Kevin Braden, the service manager in charge of all the service technicians, to have a meter rolled back.

Michael Cooper, a former salesperson with Roche, testified that he heard Jerry Rock tell Kenneth Hoefler, a former Copy Center employee, to roll back the meter on a machine. .

Hoefler testified that in March or April 1987, in Norfolk, Nebraska, he was asked by Jerry Rock if he had yet learned how to turn meters back. Hoefler stated that in February 1988, Jerry Rock asked him to turn the meters back to zero on two 2055 copiers that had previously been demos. Hoefler testified that he refused and that Jerry Rock became upset. According to Hoefler, Braden telephoned Hoefler later that afternoon and insisted that Hoefler turn back the meters. Hoefler testified that he again refused, acknowledging that doing so put his employment at risk.

Hoefler also testified that most new copiers had a negative setting at the time they were set up, so that when the meter reached zero, it had already produced approximately 50 copies.

On cross-examination, Hoefler testified that he knew that a coworker, whose first name was Calvin, had turned back a meter; Hoefler stated that he did not look at the meter readings on this machine, nor did he know where this copier went after the meter had been altered.

Calvin Krohn, a former service manager at The Copy Center in Lincoln, testified that he was under the direction of Goltl and Braden. Krohn stated that Braden was the Roche service manager in Omaha. Krohn testified that he had rolled back copier meters 8 to 10 times. One of the machines altered was the meter on the copier sold to Naber's. According to Krohn's testimony, Goltl directed him to alter the meter on this particular machine in addition to the meters on four other copiers. Krohn testified that it was common practice to roll back the meters on demos so that they would read zero. Krohn testified that he was told by Braden to roll back the meters and not to worry about getting into trouble because only Jerry Rock would be held accountable. Krohn stated that Mueller also asked him to roll back copier meters.

John Kuchta, president of Lincoln Office Equipment, was called by the State to testify regarding value. Kuchta has been selling copiers since 1970. He testified that it is not uncommon for copier dealers to use a formula in determining the reduction in price of a new machine that has been used as a demo. The formula used by Lincoln Office Equipment is to discount 1 cent per copy if the copier has over 100,000 copies on it. If the copier has fewer than 100,000 copies, a flat dollar figure is used to determine the discount.

In connection with the sale to Naber's, in Kuchta's opinion a Mita 4055 copier with approximately 800,000 copies on it would have had a value of approximately $2,000 in January 1990. The same copier with approximately 375,000 copies on it would have been worth approximately $2,500 in January 1990.

In connection with the sale to the NPA, Kuchta testified that a new Mita 2555 with a sorter and feeder was worth approximately $4,500 in December 1989. With 2,000 copies on it, however, the value would fall to $4,000. The prices given by Kuchta were derived from a publication entitled "Data Quest," published by a company of the same name which is a division of Dun & Bradstreet.

Defense witnesses generally denied the allegations made by the State's witnesses. Jerry Rock testified that he did not roll back or order the rollback of any machines. Sandra Rock testified that rollbacks were not an approved or accepted part of business policy. Other employees of Roche testified that they had not rolled back meters or seen meters rolled back.

Regarding the value of the Mita copiers, the defense called as a witness Joe Wilson, the president of Data Business Systems in Cape Girardeau, Missouri, who had been in the copier business for 17 years. Wilson offered testimony generally that the value of a reconditioned copier was not affected by the number of copies on it or by the competitive market. He testified that the value of a copier is influenced by changes in technology. He gave the opinion that the "new" copier sold to the NPA was valued at $5,036.40 and that if he were to sell a used copier such as that sold to Naber's, it would not make any difference in pricing whether it had made 300,000, 800,000, or 1,500,000 copies, because after being refurbished, it was essentially a new machine.

ANALYSIS

*Corporate Liability for Theft by Deception.*

Relying primarily on *Mueller v. Union Pacific Railroad*, 220 Neb. 742, 371 N.W.2d 732 (1985), Roche argues on appeal that a corporation cannot be guilty of theft by deception because it cannot form the requisite intent. We do not agree.

*Mueller* was a wrongful termination case in which some former employees alleged, inter alia, that a manager of railroad security and special services had caused contributions of railroad funds to be made to certain candidates for public office in a manner which circumvented the disclosure requirements of Nebraska's Political Accountability and Disclosure Act, a violation of which is a Class III misdemeanor. The Nebraska Supreme Court found that the allegations in the complaint were lacking specificity and that without further description, the manager's acts did not imply in him an authority to make political decisions for the railroad. Although potential liability was not properly pleaded in *Mueller*, the Nebraska Supreme Court observed that

> [w]hile a corporation may be convicted of certain types of criminal acts committed by its agents, even if the acts have been forbidden by the corporation, in order to impose such criminal liability against the corporation, the agent must have been acting within the scope of his or her authority.

220 Neb. at 751, 371 N.W.2d at 738.

At least since 1909, the U.S. Supreme Court has concluded that a corporation may be liable criminally for offenses where its agent acts within his or her authority and in which intent is an element. *New York Central R. R. v. United States*, 212 U.S. 481, 29 S. Ct. 304, 53 L. Ed. 613 (1909). With respect to intent, the U.S. Supreme Court stated: "If, for example, the invisible, intangible essence of air, which we term a corporation, can level mountains, fill up valleys, lay down iron tracks, and run railroad cars on them, it can intend to do it, and can act therein as well viciously as virtuously." 212 U.S. at 493. With respect to imputing to the corporation the acts of agents, the court further stated: "[T]he act of the agent, while exercising the authority delegated to him . . . may be controlled,

in the interest of public policy, by imputing his act to his employer and imposing penalties upon the corporation for which he is acting in the premises." 212 U.S. at 494. Similarly, in a case involving an alleged partnership violation of criminally knowingly violating interstate commerce regulations for the safe transportation of explosives, the U.S. Supreme Court stated: "[I]t is elementary that such impersonal entities [as corporations and other associations] can be guilty of 'knowing' or 'willful' violations of regulatory statutes through the doctrine of *respondeat superior.*" *United States v. A & P Trucking Co.*, 358 U.S. 121, 125, 79 S. Ct. 203, 3 L. Ed. 2d 165 (1958). Elsewhere, it has been observed: "It is the rule that . . . a corporation may be held criminally liable for acts of misfeasance, malfeasance or nonfeasance, even though the act constituting the offense may be ultra vires, or one as to which a specific intent is essential." *State v. Willard*, 54 So. 2d 183, 185 (Fla. 1951).

The statutory elements of theft by deception under § 28-512(1) are recited above, and "person," as defined in Nebraska's criminal statutes, includes corporations, § 28-109(16). In statutes defining crimes, the word "person" is usually construed to include a corporation. 19 C.J.S. *Corporations* § 737 (1990). Nebraska's statutory definition of "person," which includes corporations, applies throughout the Nebraska Criminal Code "unless the context otherwise requires." § 28-109. The context in which "person" is used in the statute defining theft by deception does not require the exclusion of corporations.

Two Nebraska cases involving buying and selling grain discuss the concept of intent as used in the theft by deception statute. In *State v. Sailors*, 217 Neb. 693, 699-700, 352 N.W.2d 860, 864 (1984), the court observed: "It is the required element of guilty knowledge, criminal intent, which distinguishes a civil breach of contract from theft by deception—a person's knowingly creating a false impression in order to obtain another's property." The expression "property of another," as applied to this case, refers to the money received by Roche.

In *State v. Ladehoff*, 228 Neb. 812, 816, 424 N.W.2d 361, 363 (1988), the Nebraska Supreme Court stated that in the

context of theft by deception, "The intent of the defendant may be inferred from the words and acts of the defendant and from the facts and circumstances surrounding his or her conduct." This explanation of intent is consistent with the general rule that "[i]n the context of a criminal statute, 'intentionally' means willfully or purposely, and not accidentally or involuntarily." *State v. Williams*, 243 Neb. 959, 966, 503 N.W.2d 561, 566 (1993).

■ Based on the foregoing analysis, we conclude that a corporation may be guilty of the intentional crime of theft by deception.

*Theft by Deception.*

Roche argues that even if a corporation can be guilty of theft by deception, the evidence is legally insufficient because the evidence is not persuasive. We do not agree.

In arguing that the evidence was insufficient, Roche relies on the denials of the Rocks and inconsistencies in the testimony of the prosecution's witnesses, and Roche notes that the most damaging testimony was elicited from disgruntled former employees. Reviewing the facts and circumstances in the evidence favorably to the State, and noting that the trial court had the opportunity to observe the witnesses, we find the evidence recited above is sufficient to sustain the conclusion that Roche obtained the money of Naber's and the NPA by deceiving them regarding the condition of the copiers they purchased. The evidence also shows that Roche willfully did so through its authorized agents who, acting within the scope of their duties, rolled back the copier meters and thereby created a false impression as to the condition and pecuniary value of the machines sold. The evidence shows that it was an accepted practice for Roche's salespeople to misrepresent the age and condition of copiers sold by Roche. These misrepresentations necessarily involved consideration of such factors as the useful life of the machines, expected frequency of repair, projected downtime, and premature replacement. Thus, the elements of theft by deception have been sufficiently proven.

*Evidence of Value.*

Roche argues that value is an element of the crime charged

and that the evidence fails to establish the value of the copiers sold to Naber's and the NPA. We do not agree that value is an element of the crime of theft by deception. We do conclude, however, as detailed more fully below, that for grading and sentencing purposes, the evidence regarding value as to the count involving Naber's is insufficient, that for sentencing purposes, the evidence regarding value is insufficient as to the count involving the NPA, and that Roche should be resentenced.

The Nebraska theft by deception statute contains the following concluding language: "The word deceive does not include falsity as to matters having no pecuniary significance, or statements unlikely to deceive ordinary persons in the group addressed." § 28-512. This language is patterned on the Model Penal Code § 223.3 (1980), which makes clear that the statute applies to a wide variety of acts of deception except those amounting to mere puffing. See *State v. Sailors*, 217 Neb. 693, 352 N.W.2d 860 (1984). See, also, *State v. Pierce*, 231 Neb. 966, 439 N.W.2d 435 (1989) ("pecuniary loss" in the criminal mischief statute means monetary loss suffered by another as the result of the defendant's conduct); *State v. Kelly*, 125 N.H. 484, 484 A.2d 1066 (1984) (in a theft by deception case, the state must show pecuniary loss to the victim).

The Nebraska Supreme Court specifically held in a 1989 theft case, *State v. Culver*, 233 Neb. 228, 231, 444 N.W.2d 662, 665 (1989), that "[t]he value of the property stolen is no longer an element of the crime and is important only in determining the penalty." Recently, the Nebraska Supreme Court stated that "[u]nless specified by the statute defining a criminal offense of theft, the value of property is not an element of the crime of theft, but is relevant to the grade of the offense and determines the penalty that may be imposed on conviction." *State v. Garza*, 241 Neb. 256, 263, 487 N.W.2d 551, 556 (1992) (where evidence consisted of price tags, value not adequately proved in shoplifting case). The value of property is a question for the fact finder, whose finding will not be set aside unless clearly erroneous. *Id*. "Although value is not an element of theft, the State must prove, by evidence beyond a reasonable doubt, the value of the property that is the subject of

the theft charge." *Id.* at 263, 487 N.W.2d at 556.

The issue of value relates to the punishment to be imposed on Roche; value is relevant to the determination of the grade of theft prosecuted. See *Garza, supra*. Our inquiry regarding value, therefore, is made in connection with the trial court's conclusions that the value of the crime as to Naber's was $405 and punishable as a Class IV felony, and the value of the crime as to the NPA was $180 and punishable as a Class I misdemeanor.

In *Garza*, the Nebraska Supreme Court stated that "[v]alue to be proved concerning a theft charge is market value at the time and place where the property was criminally appropriated," 241 Neb. at 263, 487 N.W.2d at 556, and "value, in relation to a theft charge, is the price obtainable for property offered for sale in a market," 241 Neb. at 264, 487 N.W.2d at 557. We logically apply the holdings regarding value in connection with the grading of offenses in *Garza*, which was a shoplifting case, to the instant case involving theft by deception.

Viewing the evidence most favorably to the State, we determine that the used Mita 4055 copier which Naber's bought, with a meter reading of 375,254, actually had 870,308 copies on it. The State's value witness, Kuchta, testified on direct examination that in January 1990, in Lincoln, a used Mita 4055 copier would have been valued at $2,000 if it had 800,000 copies on it and $2,500 if it had 375,000 copies on it. On cross-examination, Kuchta varied these values upward. Naber's paid $1,595 for a copier which had over 800,000 copies on it. Keith Naber testified that price was an important part of the transaction and that he would have paid less than $1,595 if he had known the copier had an additional 500,000 copies on it.

The court found that the value of the crime as to Naber's was $405, thereby grading the offense as one between $300 and $1,000 and punishable as a Class IV felony. See § 28-518(2). At the sentencing hearing, the court ordered Roche to pay restitution to Naber's in the amount of $405. The evidence of value as to the Naber's sale is uneven. Reference to the State's expert's testimony alone suggests that Naber's got a good deal. Keith Naber's testimony, however, speaks directly to value as

defined in *Garza*. Naber's was a willing buyer in the relevant marketplace, and it would have paid an unspecified amount less than $1,595 for the used copier actually received.

We are aware of *State v. Forshee*, 588 P.2d 181 (Utah 1978), which held in a theft by deception case that where the odometer was turned back on a used car and where the victim testified that he would not have purchased the car had he known the true mileage, the value of the property was found to be the amount received by the defendant. We note, however, that the amount received by the defendant was necessarily the value and amount paid by the victim. Elsewhere, it was held in a theft by deception case that the victim's testimony as to value, although inconsistent, supported the conviction. *State v. Heintze*, 482 N.W.2d 590 (N.D. 1992). We agree with the reasoning in *Heintze*.

Based on the foregoing, we conclude that the trial court's finding that the value of the deception was $405, which is an amount between $300 and $1,000 and punishable as a Class IV felony, is unsupported by relevant evidence and, therefore, is an erroneous finding that was the basis for the felony sentence imposed on Roche. However, the evidence shows, beyond a reasonable doubt, that the deception had some intrinsic value that translates into nominal market value, notwithstanding the absence of evidence establishing a specific value. In reaching this conclusion, we rely on *Garza, supra*, in which the Nebraska Supreme Court found that the price tags of the shoplifted goods, without more, failed to establish value punishable as a felony, but that the evidence showed the property stolen had intrinsic value. See, also, *State v. Redding*, 213 Neb. 887, 331 N.W.2d 811 (1983) (in an attempted theft by deception action, if all that is proven beyond a reasonable doubt is that goods of value were stolen, it is a Class II misdemeanor).

## CONCLUSION

Based on the foregoing, we affirm the convictions and vacate the felony sentence imposed on Roche in connection with the sale to Naber's, and remand this matter to the district court with direction to impose an appropriate sentence on Roche for misdemeanor theft by deception with a value of less than $100,

a Class II misdemeanor. See § 28-518(4).

With respect to the "new" Mita 2555 copier which the NPA bought from Roche, Kuchta testified that in December 1989, in Lincoln, a new Mita 2555 copier was worth approximately $4,500. Kuchta stated that with 2,000 copies on it, the value of the Mita 2555 would fall to $4,000. The NPA paid $4,220 for a "new" Mita 2555 copier which, viewing the evidence most favorably to the State, we find had been used as a demo and had 2,000 copies on it.

The evidence shows that the NPA had a demo copier removed and sought to purchase a new machine. Roche reinstalled the demo as if it were new, thereby deceiving the NPA as to the item purchased. The deception clearly had pecuniary significance. By finding that the value of the crime as to the NPA was $180, the trial court categorized the theft for grading purposes as one having a value of between $100 and $300, thereby resulting in its being treated as a Class I misdemeanor. See § 28-518(3). Since the evidence consisted of opinion testimony that the NPA in effect paid $220 too much and that NPA sought to buy a new, rather than a slightly used, copier, the determination of value by the fact finder which established the grade, and therefore the punishment, was not clearly erroneous. See *State v. Culver*, 233 Neb. 228, 444 N.W.2d 662 (1989) (even if jury finding of value was erroneous, the error was not prejudicial because the value found was supported by evidence and the verdicts were in the category punished).

We note, however, that the sentence imposed on Roche was restitution to be paid to the NPA in the amount of $180. Under § 29-2280, the sentencing court may order the defendants to make restitution for "the actual damages sustained by the victim." Although we find that a sentence of restitution was not an abuse of discretion, the amount ordered to be paid by Roche was not supported by the record. See *State v. Yost*, 235 Neb. 325, 455 N.W.2d 162 (1990). Under the restitution statute, "[t]he amount of restitution shall be based on the actual damages sustained by the victim and shall be supported by evidence which shall become a part of the court record." § 29-2281. See, also, *Yost, supra.* In the instant

case, representatives of the NPA testified at trial that they wanted a new copier, as opposed to a demo, but they did not claim to have been damaged in a specific dollar amount. The victim statement in the presentence report is incomplete and does not claim an amount of actual damages. Therefore, based on the record, we conclude that the trial judge abused his discretion in concluding that the actual damages as to NPA were $180 and in ordering restitution in that amount. Accordingly, this order of restitution is also vacated, and the cause is remanded for a new sentencing hearing.

AFFIRMED IN PART, AND IN PART VACATED
AND REMANDED WITH DIRECTIONS.

HANNON, Judge, dissenting.

I must respectfully dissent from significant portions of the majority's opinion. To the extent that a crime was committed, I readily agree with the majority's opinion that the corporate defendant can be guilty of the crimes charged and that the evidence convincingly establishes that the defendant corporation practiced deception as that term is used and defined in Neb. Rev. Stat. § 28-512 (Reissue 1989). However, I cannot agree with the majority's application of the facts to § 28-512 and to the grading of the offenses under Neb. Rev. Stat. § 28-518 (Reissue 1989).

"A person commits theft if he obtains property of another by deception." § 28-512. Theft by deception is graded under § 28-518 based upon "the value of the thing involved." The victims transferred only cash to the defendant. In theft by deception cases, the property obtained and the thing involved are necessarily the same. In both the crimes charged, this is cash, not the copiers. The question is, How much, if any, cash did the defendant obtain from each victim by its deceptions?

Evidence of the value of the copiers as they were presented by the defendant or as they really existed is relevant only to establish the pecuniary significance of the deceptions. If the defendant is convicted, such evidence is relevant to establish the loss sustained by the victims for restitution purposes under Neb. Rev. Stat. § 29-2280 (Reissue 1989). When cash is the property obtained by any sort of theft, evidence of its value is obviously unnecessary to establish the grade of the crime. The

fact that the victim received something of value in exchange for the cash is immaterial in grading the offense.

Other jurisdictions have considered the question of the value of property obtained by deception for purposes of grading the offense when the victim received property of value in exchange for that obtained by deception. In *State v. Forshee*, 588 P.2d 181 (Utah 1978), the defendant set back the odometer on the motor vehicle he sold the victims. One of the victims testified he would not have purchased the vehicle if he had known its true mileage. The defendant argued that the fair market value of the vehicle should have been subtracted from the price paid by the victims for purposes of grading the crime and that, therefore, he was guilty of only a misdemeanor. The statute made it a crime to obtain or exercise control over the property of another by deception. The court held that the degree of the crime must be measured by the value of the property obtained by the defendant as a result of the deception and that the value of any property received by the victim is immaterial. Similar holdings can be found in the following cases: *People v. Ross*, 25 Cal. App. 3d 190, 100 Cal. Rptr. 703 (1972); *People v. Hess*, 10 Cal. App. 3d 1071; 90 Cal. Rptr. 268 (1970); *State v. Aurgemma*, 116 R.I. 425, 358 A.2d 46 (1976); and *LaMoyne v. The State*, 53 Tex. Crim. 221, 111 S.W. 950 (1908). The only cases I have located holding the other view are *Gaskins v. State*, 38 S.W. 470 (Tex Crim. App. 1895); *Perry v. The State*, 39 Tex. Crim. 495, 46 S.W. 816 (1898); and *Lively v. State*, 74 S.W. 321 (Tex. Crim. App. 1903), and these cases were overruled by *LaMoyne*.

Naber's paid $1,595 for the copier charged in count I, and the NPA paid $4,200 for the copier charged in count II. If that amount of money was obtained by deception, the crimes are felonies. However, while there is not much doubt that Naber's was defrauded by the defendant's deception, there is no evidence that Naber's parted with its money because of the deception. However, Keith Naber did not testify that he would not have bought the copier but for the deception, but, rather, that he would not have paid as much for the copier. He did not testify how must less. For this reason, I do not think the State proved that the defendant obtained Naber's money by deception, and therefore I would dismiss count I.

Count II is different because the evidence would support a finding that the NPA would not have bought the copier it did buy if the deception had not been practiced. The defendant was guilty of a felony, but it was charged with only a Class I misdemeanor, and therefore that conviction should be affirmed. I would also affirm the restitution ordered, because the evidence shows that had the deception not been practiced, the copier the victim received would have been worth at least $180 more, and this is adequate proof of "the actual damages sustained by the victim."