STATE OF NEBRASKA, APPELLEE, V. WILLIE C. ROWE, APPELLANT.
423 N.W.2d 782

Filed May 27, 1988.    No. 87-777.

Thomas M. Kenney, Douglas County Public Defender, and Thomas C. Riley, for appellant.

Robert M. Spire, Attorney General, and Laura L. Freppel, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Defendant-appellant, Willie C. Rowe, a black man, was charged in one case with second degree murder in violation of Neb. Rev. Stat. § 28-304 (Reissue 1985), and with the use of a knife to commit that felony in violation of Neb. Rev. Stat. § 28-1205 (Reissue 1985). As a result of the same incident, but in a separate case, Rowe was charged with robbery in violation of Neb. Rev. Stat. § 28-324 (Reissue 1985), and with the use of a knife to commit that felony. The two cases were consolidated and thereafter tried to a jury, which found Rowe guilty of all four charges. He was so adjudged and thereafter sentenced on each conviction. In this appeal, Rowe asserts the trial court erred in failing to (1) find the State impermissibly exercised its peremptory challenges so as to exclude members of his race from the jury and (2) suppress certain statements he made to the police. Finding no merit in either assignment, we affirm.

At approximately 4:15 a.m. on September 10, 1986, Omaha Police Officer Timothy Cavanaugh responded to a police call in the area of 25th Avenue and Leavenworth Street in Omaha, where he found a large white man, later identified as John Bevins, lying on the ground in a parking lot. The victim was still alive, but he was "saturated with blood," and one of his eyes was bulging out of its socket. He later died as a result of the blood lost from the 66 knife wounds inflicted upon him.

Shortly thereafter, Omaha Police Officer Michael Piernicky responded to a radio broadcast which provided the description

of a possible suspect. As the officer reached the area of 25th Avenue and Marcy Street, he was flagged down by a man who identified himself as Jon Duin and as the one who had placed the emergency call regarding a stabbing in the area. Duin then volunteered the information that the person who might have done the stabbing was known to him as "Willie" and that Willie might live at apartment 8 of a South 24th Street address. Omaha Police Officer Lori Glover then proceeded to the apartment address given by Duin, where she was met by two other officers. Because the building was the site of frequent disturbances, a tenant had previously given Glover a key to the outside security door. The three officers entered the building and proceeded to knock on the door of apartment 8. The door was answered by Bertha Thomas. When first asked if Willie was there, Thomas responded she did not know a Willie. All three officers testified that they could hear noises coming from inside the apartment. Thomas then stated she had a son named Willie but that he was in California. Some further conversation took place between Thomas and the officers, all amounting to a denial by Thomas that Willie was inside. Finally, another noise came from inside the apartment, Thomas looked nervously over her shoulder into the apartment, and then "stepped back." The officers thereupon entered the apartment, where they found Rowe, who first misidentified himself, lying on the floor. He was bloody and was wearing a bloody T-shirt. A search uncovered a bloody gold wristwatch with a broken band still wet with blood, $37 in bloody cash, a bloody knife, some bloody traveler's checks, and other papers belonging to the victim. At the time of Cavanaugh's search at the scene, he saw no watch on the victim but found a check stub and some traveler's check receipts in the victim's pockets.

At trial, Duin testified that on the evening of the killing, he had been drinking at a bar on 24th and Leavenworth Streets, along with his roommate, John Klahn, and the victim. Also at the bar were Rowe and his girlfriend, a prostitute known as Lukmilla or Vanessa Brown. Both Rowe and Brown were acquaintances of Duin's. At 1 a.m., the five proceeded to Duin's house, which was nearby, at 25th and Marcy. They sat on the porch, drank beer which had been purchased at the bar, and

smoked marijuana.

At approximately 3:30 a.m., the conversation between Rowe, Brown, and the victim turned to sex, and a deal was struck whereunder Brown would perform a sexual act with the victim for a $20 consideration. Duin, Brown, the victim, and Rowe then began to walk toward Leavenworth Street. At some point, Brown and the victim left the others and walked toward a secluded area. Rowe and Duin kept traveling toward Leavenworth Street. Shortly thereafter, screams from a "hysterical" Brown were heard coming from the secluded area. Although the evidence of the sequence of events which followed is unclear, it appears Rowe then chased the victim toward Leavenworth Street.

After assuring himself that Brown was not injured, Duin walked toward 25th and Leavenworth. Duin testified that Rowe came around a corner, where he observed that Rowe was covered with blood and was holding a knife. Rowe grabbed Duin, started running, and said, "We got to get out of here" and, later, "I had to waste him." Because Duin had a wooden leg and could not keep up with Rowe, they split up, whereupon Duin placed the call which brought the police to the scene.

After being arrested and given the *Miranda* warnings, Rowe was taken to the police station. At the station Rowe was again given the *Miranda* warnings. While Glover was completing reports and before formal questioning began, Rowe said to Glover that a homosexual had started a fight with him after the homosexual tried to get his (Rowe's) girl. Rowe further said the homosexual had pulled a knife on him and that he took it away to defend his girl.

Defendant was later taken to a room for questioning by Omaha Police Officer James Wilson. Using an Omaha police rights advisory form, Wilson again advised Rowe of his *Miranda* rights, asking whether Rowe understood each right. In response to whether he, knowing his rights in the matter, was willing to make a statement, Rowe replied, "Yes." Rowe then related that he was in the area of 22d and Jones Streets, heard his girlfriend screaming, came around a corner, and was confronted by an unknown individual with a knife, whom Rowe disarmed and stabbed. Upon being told by Wilson that

his version of the occurrence differed from that of others, Rowe responded, "[Y]ou got me, I'll tell you the truth." This time, Rowe related the events of drinking at the bar and at Duin's house; leaving Duin's house with Duin, Brown, and the victim; the prostitution deal; and of hearing Brown's screams. Rowe also stated that upon chasing and catching the victim, the victim hit Rowe in the head with his fist, so, because Rowe thought the victim was too strong, Rowe repeatedly stabbed the victim. The victim fell to the ground, and Rowe took his wallet because he did not think the victim had paid Brown. Rowe gave a taped statement to the police reflecting the last-mentioned version of the killing.

At trial, Rowe testified that he chased the victim to the area where the victim was found, and because the victim hit him in the head, he stabbed the victim to defend himself. Rowe took the wallet to confuse the police as to the identity of the victim, but denied taking the victim's watch.

Rowe's first assignment of error rests on the overruling of his motion asking that the trial court order a mistrial or, in the alternative, require that the State withdraw its peremptory challenges to certain of the black venirepersons. Rowe points out the difference in the races of the defendant and victim; that of the 36 venirepersons passed for cause, 6 were black; and that the prosecutor peremptorily struck 5 of those 6.

Although a criminal defendant has no right to a petit jury composed in whole or in part of persons of her or his own race, *Strauder v. West Virginia*, 100 U.S. 303, 25 L. Ed. 664 (1879), the equal protection clause of U.S. Const. amend. XIV bars a prosecutor from challenging potential jurors "solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). In so holding, *Batson* overturned the evidentiary standard contained in *Swain v. Alabama*, 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965), which required a showing of systematic exclusion of black jurors over time, and established a new multistep standard of proof for showing discrimination in the jury selection process. In order to make a prima facie case of

discrimination in the selection of a jury, a criminal defendant must show that (1) she or he is a member of a cognizable racial group, (2) the prosecutor used peremptory challenges to remove members of the defendant's race from the venire, and (3) the facts and other relevant circumstances give rise to an inference that the prosecutor used those challenges to exclude potential jurors because of their race. Once the defendant has made a prima facie case, the burden shifts to the State to provide a neutral explanation for the challenges related to the particular case to be tried. The explanation need not rise to the level of a challenge for cause, but neither may the prosecutor rebut defendant's prima facie case by stating that potential jurors were struck based on the intuitive judgment that they would be partial to defendant because of their shared race. *Batson v. Kentucky, supra; State v. Walton*, 227 Neb. 559, 418 N.W.2d 589 (1988); *State v. Alvarado*, 226 Neb. 195, 410 N.W.2d 118 (1987); *State v. Threet*, 225 Neb. 682, 407 N.W.2d 766 (1987).

In the case before us, the prosecutor explained that he wanted to remove women jurors because prostitution was involved. He was of the opinion that women are more sensitive to the problem of prostitution than men and would therefore be distracted from the murder issue. Of the 12 venirepersons stricken by the State, 9 were women. Of the black venirepersons stricken, three were women. The prosecutor further explained that gender alone accounted for his peremptory challenge of the first black woman he struck from the venire. The second black woman was stricken not only because of her sex but also because she knew one of the police officers endorsed as a witness in the case. The third was stricken not only because she is a woman but also because, as a Job Service employee, she was engaged in a form of social work. It was the prosecutor's belief that social workers tend to blame everyone but a defendant for whatever deficiencies a defendant's conduct may display. Moreover, he detected that this woman responded mildly to his questions but "cheerfully and very favorably" to those of defense counsel.

Of the two black men peremptorily challenged, one was stricken because, although he said he could keep an open mind

and decide the defendant's guilt or innocence based on the evidence presented at trial, he had nonetheless heard of the incident through "street talk," and because he was vague in discussing the sources of his knowledge. The second black man was stricken because he was single and worked at the Omaha Playboy Club. It was the prosecutor's impression that irrespective of race, people working in such environments do not make desirable jurors from the State's point of view. In addition, the prosecutor pointed out that he also struck another young, single venireperson because he felt young, single persons do not have much at stake in the community.

Rowe urges the district court erred by not analyzing the prosecutor's voir dire examination to determine whether it was such as to raise an inference of a discriminatory purpose, and to determine whether the prosecutor in fact discriminated against black venirepersons in the jury selection process.

The first argument relates to whether Rowe made the requisite prima facie showing of a discriminatory intent. It is, however, unnecessary to specifically determine whether Rowe met his prima facie burden, for in *State v. Walton, supra,* we held that if the trial court does not state on the record that the defendant met her or his burden of proving a prima facie case, it does so implicitly by asking the State to articulate its reason for the questioned strikes. Thus, we must treat this matter as if the trial court concluded that Rowe established a prima facie case of discrimination in the jury selection process. The question thus becomes whether the record supports the trial court's finding that the State provided adequate neutral explanations for its actions. In this connection Rowe in effect argues that the neutral reasons given by the prosecutor are not worthy of belief. He contends the facts that the prosecutor asked no individual questions during voir dire of three of the black venirepersons he struck, that he struck another who swore he could decide the case on the evidence notwithstanding the fact he had heard "street talk," and that he struck still another who was asked only general questions establish the pretextual nature of the stated reasons.

In conducting our review of this phase of the matter, we must bear in mind that the trial court's determination as to whether a

defendant has established purposeful discrimination in the selection of a jury is a finding of fact entitled to appropriate deference from a reviewing court. *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). Indeed, we have held that such findings are not to be reversed on appeal unless clearly erroneous. *State v. Walton*, 227 Neb. 559, 418 N.W.2d 589 (1988); *State v. Alvarado*, 226 Neb. 195, 410 N.W.2d 118 (1987). While we agree with defendant's contention that in making the determination the entire voir dire should be considered, we cannot agree with his suggestion that only the information elicited as a result of the prosecutor's inquiries is important. It matters not from what source the prosecutor obtains the information on which she or he acts; the prosecutor may rely on the questions asked by the court or defendant, as well as on the prosecutor's own inquiries. The question is whether the total record supports a finding that the jury selection process was not discriminatory.

The language of a California intermediate appellate court is helpful in providing an understanding as to why such deference to the trial court is particularly appropriate in the context of evaluating the bases of a peremptory challenge:

Jury selection is, in itself, an inexact science, based as often on hunches and inferences about human behavior as on hard facts. By their very nature, peremptory challenges particularly lend themselves to the application of popular psychology, the consideration of unarticulated values, and the varied experiences—both at trial and in life—of the attorneys who use them. As a result, a decision to exercise a peremptory challenge may be based on factors that an appellate court cannot see when reviewing a cold record.

In practical terms, observing potential jurors may reveal as much about them as counsel may learn from listening to them. As if to underscore the importance of the visual aspect of jury selection, the legal term used to describe this process—"voir dire"—is itself a combination of two French verbs meaning "to see" and "to say." (See Cassell's French-English Dict. (1982) pp. 259-260, 757.) The importance of observation during voir dire extends to court and counsel alike. During voir dire, the trial judge

has had an opportunity to observe counsel's behavior as well as the demeanor of prospective jurors.

*People v. King,* 195 Cal. App. 3d 923, 932, 241 Cal. Rptr. 189, 194 (1987).

In the most recent case of *State v. Walton, supra,* we affirmed the trial court's finding that the prosecutor's peremptory challenges were not racially motivated. The prosecutor explained that in using three of the State's six challenges to eliminate from the jury persons who shared the defendant's black race, he struck one because she was unemployed, single, lived at a particular address, and did not have community ties showing the stability sought by the State. He struck another because she was possibly related to an individual previously prosecuted by the prosecutor's office. He struck the third because he was married to a social services worker, in connection with whom the trial judge expressed the view that people working in that field have a tendency to place blame for one's wrongful conduct on others.

In *State v. Alvarado, supra,* we held that merely showing defendant had a Hispanic surname did not establish he was in fact a member of a cognizable racial group, and, thus, defendant failed to prove a prima facie case of discrimination in the jury selection process. We also observed that if the venireperson whose elimination was challenged shared the defendant's race, the prosecutor's explanations that she was stricken because she was young and he feared she might identify with some of the young defense witnesses expected to appear at trial, and because of the unavailability of a juror background questionnaire for her, were adequate to support the trial court's finding that she had not been eliminated for a racial reason.

In *State v. Threet,* 225 Neb. 682, 407 N.W.2d 766 (1987), we held the prosecutor's explanation that he struck the two black venirepersons because one knew about the case and her father had lived near the defendant and the other knew one of the potential witnesses adequately supported the trial court's finding that the strikes were not racially motivated.

We find nothing in this record which compels a conclusion that the prosecutor's neutral reasons were pretextual and, thus, that the trial court's finding he did not discriminate against

blacks in the jury selection process is clearly wrong. Accordingly, the first assignment of error is without merit.

In his second and last assignment of error, Rowe claims the trial court erred in not suppressing the statements he made to the police because the *Miranda* warnings he was given were inadequate.

As noted earlier, the record reveals that Rowe was given the *Miranda* warnings on three occasions. On the last occasion he was read the following six questions verbatim:

> I would like to advise you that I am a Police Officer. Do you understand that?
>
> You have a right to remain silent and not make any statements or answer any of my questions. Do you understand that?
>
> Anything that you may say can be and will be used against you in court. Do you understand that?
>
> You have the right to consult with a lawyer and have the lawyer with you during the questioning. Do you understand that?
>
> If you cannot afford a lawyer, the court will appoint one to represent you. Do you fully understand that?
>
> Knowing your rights in this matter, are you willing to make a statement to me now?

On that occasion Rowe answered each of the foregoing questions affirmatively, as he had to similar questions on the two earlier occasions.

Nonetheless, Rowe claims his understanding of his rights was deficient. While he asserts this in part was so because he was not told he could stop the questioning at any time, his argument focuses mainly on his allegedly incomplete understanding of his right to an attorney. In support of this claim Rowe offers the following colloquy between himself and his attorney at the suppression hearing:

> Q. All right. Another right says: "If you can't afford a lawyer, the Court will appoint one to represent you." Now, you knew you couldn't afford a lawyer; right?
>
> A. Yes.
>
> Q. Well, when they tell you that if you can't afford a lawyer and the Court will appoint one to represent you,

what does that mean?

A. Well, I thought it meant that if I couldn't afford a lawyer, well, I can't afford one, but the Court will appoint one to me. I thought I wouldn't get one until I went to court.

Q. Right. And that's what it says, isn't it?

A. Yes.

Q. When you go to court; true?

A. True.

Q. So what this meant to you was that if you don't have enough money, you have to wait until you get to court, and then the judge will say, "Okay, you can have a lawyer"; right?

A. Right.

Q. So did you feel you could have a lawyer with you down there at that time if you couldn't afford one?

A. No, I didn't.

Rowe argues that "the impression left in his mind is precisely that which is desired by the police interrogators, and that is to confuse the indigent defendant in such a way as to lead him to believe he will not get an attorney until he goes to court." Brief for Appellant at 11.

Before we go further in our analysis of this issue, it is well to remind ourselves that in determining the correctness of a trial court's ruling on a motion to suppress, this court will uphold a trial court's findings of fact unless those findings are clearly wrong. *State v. Gibson, ante* p. 455, 422 N.W.2d 570 (1988); *State v. Brown,* 225 Neb. 418, 405 N.W.2d 600 (1987). See, also, *State v. Nash, ante* p. 69, 421 N.W.2d 41 (1988).

In determining that the defendant's mistaken belief that a custodial oral statement would not be admissible in evidence did not render his waiver of the right to remain silent unintelligent, we observed that the test for determining whether a defendant acted intelligently regarding any *Miranda* right is whether, at the time of the waiver, the defendant possessed the capacity to understand and act in response to the warnings given by an interrogating officer. *State v. Norfolk*, 221 Neb. 810, 381 N.W.2d 120 (1986).

The evidence is more than ample to support the district

court's implicit findings that at the relevant time Rowe did indeed have the requisite capacity to understand and act in response to the warnings, and was not misled. As he was being transported to the police station, he threatened to sue the police for arresting the wrong person, stating that he would press charges against them if they had the "wrong guy." He tried to conceal the crime by removing the victim's wallet, and to exculpate himself by misstating his identity when first confronting the arresting officers. In addition, he gave three conflicting stories in an effort to fit what the police knew from others. Moreover, he had close association with the "street people" of his area, including his prostitute girlfriend. And he appeared coherent as he was being questioned. His coaxed trial testimony regarding his understanding does not overcome the circumstances surrounding his statements.

Rowe's heavy reliance on *State of South Dakota v. Long*, 465 F.2d 65 (8th Cir. 1972), in urging a contrary conclusion is misplaced. Therein, the interrogating officer had developed a mutual, trusting relationship with Long which continued through the interrogation. Although the sheriff advised Long he had the right to an attorney, Long was not told that if he could not afford an attorney, one would be appointed for him prior to questioning. Thus, the court concluded Long's statements were inadmissible.

However, the *Long* circumstances are not the circumstances in this case. Although Rowe was not told he could stop talking at any time, he was informed of his right to a court-appointed attorney not once but three times. Rowe's second and last assignment of error is as devoid of merit as was his first.

Accordingly, the judgment of the district court is affirmed.

AFFIRMED.