STATE OF NEBRASKA, APPELLEE, V. LORI A. CULVER, APPELLANT.
444 N.W.2d 662

Filed August 18, 1989.    No. 88-419.

Dennis R. Keefe, Lancaster County Public Defender, and Michael D. Gooch for appellant.

Robert M. Spire, Attorney General, and Steven J. Moeller for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

After trial to a jury, the defendant, Lori A. Culver, was convicted on four counts of misdemeanor theft and was

sentenced to probation for 2 years. As part of the sentence, the defendant was to be confined in the county jail for 90 days, with credit for 51 days, and was required to make restitution to the victims.

Upon appeal, the defendant contends that the evidence was not sufficient to sustain the verdicts of guilty and that the trial court erroneously permitted the State to exercise peremptory challenges upon the basis of gender.

The offenses consisted of stealing purses from a dressing room at a church wedding. The victims were the bride, Diane Quesada, and her attendants at the wedding on November 30, 1985, which took place at the Berean Fundamentalist Church in Lincoln, Nebraska. The room used as a dressing room was a classroom on the south hall of the church. The thefts were discovered just before the ceremony was to begin. At about that time, the defendant and a man, neither of whom were guests at the wedding, were seen leaving the church in a suspicious manner. The defendant was carrying a large, cylindrical-shaped gym bag over her shoulder, which appeared to be full.

Most of the victims and other persons who saw the defendant leaving the church were unable to make a positive identification of the defendant. However, Beth McCulley, who was a bridesmaid and whose purse was stolen, testified that at about 1:30 p.m., when she returned to the dressing room to get a Kleenex from her purse, she noticed two individuals in the doorway of the dressing room who were in the process of leaving the room. She described the individuals as a male, with light-brown hair and a mustache, who was wearing a tan trenchcoat. The other individual was a large-framed woman with very dark brown hair, wearing a royal-blue and black cape. Her observations were made from within a few feet of these individuals. After watching the individuals walk down the hall, she entered the dressing room and found her purse missing.

After the wedding, McCulley gave a brief description of the incident and the suspects to a police officer and on several occasions thereafter met with the sheriff's office in an attempt to identify the defendant. She first looked at individual photographs and then at a photographic lineup. Several weeks after the wedding, McCulley made a positive identification of

the defendant and the man that she had seen leaving the dressing room at the church on November 30, 1985. At trial, however, McCulley was unable to positively identify the defendant as the individual she had seen at the church and had no recollection independent from the photographs from which she had made her earlier identification.

There was other evidence that connected the defendant with the thefts through the use, on the day of the theft, of bank and credit cards which were stolen from McCulley. The defendant's companion, Allen Robinson, was identified through photographs made at the time the stolen bank and credit cards were used at an automatic teller machine in Lincoln. The defendant and Robinson were living together in Manhattan, Kansas, and a search of their residence resulted in the discovery of physical evidence which matched items shown in the photographs taken at the Bank-In-The-Box location in Lincoln.

Joseph Splichal, a detective sergeant in the Lancaster County Sheriff's Department, participated in the followup investigation of the thefts and specifically assisted in the execution of the search warrant. Splichal had shown McCulley a photographic lineup of possible suspects and testified that McCulley had identified the defendant as the woman she had seen leaving the dressing room at the church. McCulley had also identified the defendant's companion as Robinson.

Although much of the evidence was circumstantial, it was sufficient, if believed, for the jury to find beyond a reasonable doubt that the defendant had participated in each of the thefts. It is not the province of the Supreme Court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the finder of fact, and the verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Bowen,* 232 Neb. 725, 442 N.W.2d 209 (1989); *State v. Andersen,* 232 Neb. 187, 440 N.W.2d 203 (1989); *State v. Wickline,* 232 Neb. 329, 440 N.W.2d 249 (1989).

The defendant also contends that the evidence was not sufficient to support the finding by the jury that the items

stolen from Marissa Brownawell, a bridesmaid in the wedding, had a value of $40, and the items stolen from Barbara Morrison, the maid of honor, had a value of $50.

Neb. Rev. Stat. § 29-2026.01 (Reissue 1985) provides: "When the indictment charges an offense against the property of another by larceny, embezzlement or obtaining under false pretenses, the jury, on conviction, shall ascertain and declare in its verdict the value of the property stolen, embezzled, or falsely obtained."

Brownawell valued her purse at $15, and the contents, which included socks, new makeup, and an address book, at about $20. Morrison testified that her purse was a black leather clutch purse with a zipper across the top and contained $10 to $15, a checkbook, a J.C. Penney credit card, a Bank-In-The-Box card, a Wesleyan identification card, and a Sports Courts membership card.

Theft consists of taking or exercising control over movable property of another with intent to deprive him or her thereof. Neb. Rev. Stat. § 28-511(1) (Reissue 1985). The value of the property stolen is no longer an element of the crime and is important only in determining the penalty. See, *State v. Redding*, 213 Neb. 887, 331 N.W.2d 811 (1983); *State v. Reed*, 228 Neb. 645, 423 N.W.2d 777 (1988); *State v. Pierce*, 231 Neb. 966, 439 N.W.2d 435 (1989). To the extent that *State v. Clancy*, 224 Neb. 492, 398 N.W.2d 710 (1987), and *State v. Scott*, 225 Neb. 146, 403 N.W.2d 351 (1987), state that the value of the property stolen is an element of the crime charged, that language is disapproved. The determination of the value of the property stolen, of course, remains a question to be determined by the jury.

Neb. Rev. Stat. § 28-518(4) (Reissue 1985) provides: "Theft constitutes a Class II misdemeanor when the value of the thing involved is one hundred dollars or less."

The finding by the jury as to the value of the items stolen from the victims Brownawell and Morrison, even if erroneous, was not prejudicial, since any finding of a value of $100 or less would support verdicts of guilty of Class II misdemeanor theft.

The defendant's other assignment of error relates to the State's exercise of its peremptory challenges.

The record shows that of the 24 persons selected to be examined in voir dire, 11 were men and 13 were women. During the examination, the State exercised six peremptory challenges to exclude men. Defense counsel objected that these challenges had been made on the basis of gender discrimination and asked the trial court to require the State to explain why those individuals were struck. The defendant's request was denied.

In *State v. Thompson*, 231 Neb. 771, 779, 438 N.W.2d 131, 138 (1989), we held:

"In order to make a prima facie case of discrimination in the selection of a jury, a criminal defendant must show that (1) she or he is a member of a cognizable racial group, (2) the prosecutor used peremptory challenges to remove members of the defendant's race for the venire, and (3) the facts and other relevant circumstances give rise to an inference that the prosecutor used those challenges to exclude potential jurors because of their race."

Quoting *State v. Rowe*, 228 Neb. 663, 423 N.W.2d 782 (1988). Ultimately, we held that a "trial court's determination as to whether a defendant has established purposeful discrimination in the selection of a jury is a finding of fact which will not be reversed on appeal unless clearly erroneous." *Thompson, supra* at 780, 438 N.W.2d at 138.

In this case, the trial court made no finding that the defendant had made the required prima facie showing of discriminatory intent. In fact, the assignment of error could be disposed of on the basis that the trial court's implied finding of no showing of a discriminatory intent was not clearly erroneous. *State v. Rowe, supra*; *State v. Walton*, 227 Neb. 559, 418 N.W.2d 589 (1988); *State v. Alvarado*, 226 Neb. 195, 410 N.W.2d 118 (1987).

Our decision in *Thompson* relied on *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The defendant argues that *Batson* should be extended to apply to discriminatory practices based on gender as well as race.

The Supreme Court of Rhode Island in *State v. Oliviera*, 534 A.2d 867 (R.I. 1987), held that *Batson* does not extend to gender-based discrimination. In that case, the defendant, Oliviera, was convicted on two counts of assault with intent to

commit sexual assault and on one count of second degree child molestation. On appeal, he contended that the prosecution had discriminated against male members of the jury panel in exercising peremptory challenges in violation of the equal protection clause of the 14th amendment. During voir dire, the State had exercised six of its seven peremptory challenges to strike male members of the jury panel. The defendant objected, asserting gender-based discrimination contrary to the holding of *Batson*. The court in *Oliviera* specifically held that *Batson* did not extend to gender-based discrimination because of the fact that throughout the decision, the Court in *Batson* refers exclusively to discrimination based upon *race*. In referring to the *Batson* decision, the court stated:

> It clearly preferred to limit the new standard to racially-based discrimination.
>
> . . . .
>
> . . . [I]f the use of gender as a criterion for exercising peremptory challenges is prohibited, *all* such challenges will become inherently suspect. Opposing counsel could demand an alternative explanation for every challenge exercised. The damage to the peremptory challenge, a vital component of trial by jury, would be enormous, if not fatal.

*State v. Oliviera, supra* at 870.

Similarly, in *U.S. v. Hamilton*, 850 F.2d 1038 (4th Cir. 1988), the court held that a prosecutor's use of peremptory challenges to exclude women from a criminal petit jury because of their sex did not violate the right of a defendant to an impartial jury and to a jury drawn from a cross section of the community under the 6th and 14th amendments. The court also found that the equal protection clause does not prohibit peremptory challenges against jurors on the basis of gender.

Although the appellate court concluded that the government had exercised several of its peremptory challenges based on sex, it found

> no authority to support an extension of *Batson* to instances other than *racial* discrimination. . . .
>
> . . . .
>
> Although the Court in *Batson* relaxed the evidentiary

> burden of *Swain*, it offered no intimation that it was extending the equal protection safeguards involving peremptory strikes to gender . . . . While the strictures of the Equal Protection Clause undoubtedly apply to prohibit discrimination due to gender in other contexts, there is no evidence to suggest that the Supreme Court would apply normal equal protection principles to the unique situation involving peremptory challenges.
>
> . . . .
>
> Clearly, if the Supreme Court in *Batson* had desired, it could have abolished the peremptory challenge or prohibited the exercise of the challenges on the basis of race, gender, age or other group classification. A careful examination of the *Batson* opinion, however, leads this Court to the firm conclusion that, in light of the important position of the peremptory challenge in our jury system, the Court intended *Batson* to apply to prohibit the exercise of peremptory challenges on the basis of race only.

850 F.2d at 1042-43.

In regard to the sixth amendment claim, the court relied on *Lockhart v. McCree*, 476 U.S. 162, 173-74, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986), where the U.S. Supreme Court stated that it had

> never invoked the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large. . . . [A]n extension of the fair cross-section requirement to petit juries would be unworkable and unsound . . . .

In *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975), the Court said:

> It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular

composition, *Fay v. New York*, 332 U.S. 261, 284 (1947); *Apodaca v. Oregon*, 406 U.S. at 413 (plurality opinion); but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof. See, also, *Teague v. Lane*, ____ U.S. ____, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989).

There being no error, the judgment is affirmed.

AFFIRMED.