STATE OF NEBRASKA, APPELLEE, V. NORMA E. LOPEZ, APPELLANT.

544 N.W.2d 845

Filed March 15, 1996.   No. S-95-311.

Kevin K. Knake and Thomas J. Gaul, Deputy Hall County Public Defenders, for appellant.

Don Stenberg, Attorney General, Jay C. Hinsley, and, on brief, Delores Coe–Barbee for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

LANPHIER, J.

The defendant in this case, Norma E. Lopez, was charged with and tried in the district court for Hall County, Nebraska, for killing Sotero Gandarilla in the defendant's trailer. Following a jury trial, she was convicted of murder in the first degree and use of a weapon in commission of a felony. The defendant appeals, claiming as errors, in summary, that the district court erred in (1) not allowing certain proffered expert testimony from "Bud" Deats in the form of his conclusions upon reconstructing the crime scene, (2) overruling the defendant's motion to suppress statements made by her which were elicited in violation of her Fifth Amendment rights, (3) overruling the defendant's motion for a directed verdict, (4) not ruling that there was insufficient evidence to convict, and (5) overruling the defendant's objection to the State's striking the sole African–American juror on the panel. We affirm.

## BACKGROUND

On March 25, 1994, the defendant had a party in her trailer home. During the course of the party, the defendant and a guest, Sotero Gandarilla, started to argue. The argument continued while the defendant and Gandarilla went into a bedroom in the defendant's home. The defendant's daughter was sitting in the bedroom, and the defendant asked the daughter to find the bullets for her gun. The daughter told the defendant that she did not know where the bullets were and then went to a neighbor's house for help.

Upon returning to the home of the defendant, the daughter heard a gunshot. Upon entering the bedroom, witnesses saw Gandarilla's body on the floor and the defendant holding a gun. During the melee which followed, witnesses stated, the defendant was at one time too drunk to dial the phone.

The police responded to a call of someone hearing a gunshot. An officer went to the defendant's home. The officer knocked and the defendant appeared. The officer asked if he could enter, and the defendant replied that he could not and that she would check the trailer for him. Soon after, the defendant returned to

the front door of the trailer and stated to the officer, "He's dead; he's been shot." She initially refused to give the name of the victim.

The officer asked, "Can I come in and check?" to which the defendant answered, "Yes, you can." The officer found the body. The officer asked her the identity of the individual on the floor and the defendant's name and her date of birth, to which the defendant responded, "What? Do you think I shot him?" At that point, the officer informed the defendant of her *Miranda* rights. The officer asked if the defendant waived her rights and wanted to talk to him, to which she replied, "Yeah." It appeared to the officer that the defendant had been drinking and had apparently urinated on herself, but that she understood the questions and the situation. Several times during the preliminary investigation, the defendant told the officer, "Why don't you just go ahead and shoot me?" When a probation officer arrived at the scene to take charge of the children of the defendant, the defendant stated to the officer (a white female), "You ain't taking my baby, you fucking white bitch."

At that point, Lt. Rodger L. Williams arrived to take over the investigation. A high-powered rifle with one spent round in its chamber was found in the bedroom.

The defendant was jailed. An interview of the defendant by Williams took place the next morning at 8 o'clock at the jail at the defendant's request. The defendant signed a *Miranda* rights waiver. During the interview, Williams asked if the defendant knew why the shooting had occurred, to which the defendant stated, "Yes, because I shot him for no goddamn reason. Just for . . . being drunk and stupid I know." In response to a question as to whether the events of the previous evening occurred because the defendant had been drinking, she responded, "Oh, no, no, no. I have been that drunk before and never pulled a gun on my old man." The ammunition for the gun was found following a search pursuant to a search warrant.

It was later determined that "[t]he death of Sotero Gandarilla [was] due to a perforating gunshot wound to the neck, which caused a marked destruction of the soft tissue of the neck, severed the internal carotid artery, severed the internal and external jugular veins and, also, severed the larynx."

## EXCLUSION OF JUROR

During the voir dire before the trial, the State struck the only African–American on the panel. In response to questions, the prospective juror answered the following questions of the judge:

> THE COURT: All right. Thank you. Do you know any of the individuals, [juror], that I have gone through here?
>
> [JUROR]: Just the gentleman in the middle. I can't recall his name.
>
> THE COURT: All right. The gentleman in the middle we are going to call — we are going to put a handle on him. We are going to call him Mr. Knake.
>
> [JUROR]: Okay.
>
> THE COURT: All right. Do you know Mr. Knake?
>
> [JUROR]: Yes.
>
> THE COURT: Do you know him professionally?
>
> [JUROR]: Well, he handled a case for my son once.
>
> THE COURT: All right. You know him in his capacity as an attorney?
>
> [JUROR]: Yes.
>
> THE COURT: Did you have occasion to meet with him?
>
> [JUROR]: Yes.
>
> THE COURT: All right. About how long ago was this, [juror]?
>
> [JUROR]: Probably about three or four months ago.
>
> THE COURT: So somewhat recently?
>
> [JUROR]: Yeah.

Once the *Batson* challenge was raised, see *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the parties stipulated to the facts that the juror was of African–American descent, that the State struck her from the panel as exercising its sixth peremptory challenge, and that the juror was the only person of African–American descent on the 18–member panel.

The State articulated the following as neutral reasons for striking the juror:

> Your Honor, the Court is aware and the record will reflect [juror] was called as a replacement juror. She indicated she knew Mr. Knake [the defendant's defense counsel],

although she didn't know him by name apparently, but indicated her son had been a client of Mr. Knake's.

. . . .

The other State's reasoning here, the other thing that was noticed, you know, with this type of situation you get into peoples' [sic] heads. Basically, [juror] throughout the proceedings was sitting with what I interpreted to be hostile body language. She had her arms crossed, did not appear to wish to look over at the State, was sitting with her legs crossed away from us, seemed to be adopting a defensive position during the time she was being questioned by the Court and the State.

The court stated:

As the Court recalls, in the voir dire of [juror], she indicated the last few months, I believe, Mr. Knake, you have been employed as an attorney for a member of her family, I believe a son, in regards to criminal allegations filed against her son which she indicated that he was innocent of.

I'm going to overrule the objection.

## EXCLUSION OF PROFFERED EXPERT TESTIMONY

At trial, the court barred "crime scene reconstruction" testimony of Deats, a defense expert. The defense expert was allowed to testify in the areas of fingerprints, toolmarking, and ballistics. The defense attorney then asked the expert: "Q. Do you have an opinion based on your analysis of the distance from the floor to the rifle at the time the rifle was shot? A. Yes, I have an opinion. Q. Okay. What is that opinion?"

To this, the prosecution objected on foundation, and the court sustained. In his offer of proof, the defense attorney asked the expert if his opinion about the circumstances of the shooting was consistent with the victim lunging at the gun or trying to pull it out of somebody's hand, to which the expert replied, "It could be."

After trial, the jury returned a verdict of guilty on both counts.

A three–judge panel sentenced the defendant to life imprisonment on count I and to 10 to 15 years' imprisonment on count II.

## ASSIGNMENTS OF ERROR

On July 19, 1995, the defendant had yet to file her brief, and yet moved to amend her assignments of error. This motion was granted on July 28, and defendant was given until August 16 to file her brief. On July 27, the defendant filed a brief and assigned as errors:

1. The trial court erred in refusing to allow the defense expert, "Bud" Deats, to testify about conclusions he reached.

2. The trial court erred in overruling Norma Lopez's motion to suppress statements because the statements were obtained in violation of Ms. Lopez's constitutional rights as guaranteed by the Fifth Amendment to the United States Constitution.

3. The District Court erred by overruling the defendant's motion for a directed verdict at the close of the State's evidence and at the close of all evidence by submitting the charge of first degree murder to the jury.

4. The evidence submitted was insufficient as a matter of law for a reasonable juror to find beyond a reasonable doubt that the defendant committed first degree murder based on the circumstantial evidence of intent found in the record.

5. The trial court erred in overruling the defendant's objection to the striking by the State of the sole African–American on the juror panel.

## STANDARD OF REVIEW

An appellate court does not consider errors which are argued but not assigned. *State v. Campbell*, 247 Neb. 517, 527 N.W.2d 868 (1995); *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994).

A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. Moreover, on such a claim, an appellate court will not set aside a guilty verdict in a criminal

case where such verdict is supported by relevant evidence. *State v. Cisneros*, 248 Neb. 372, 535 N.W.2d 703 (1995); *State v. Derry*, 248 Neb. 260, 534 N.W.2d 302 (1995); *State v. Brunzo*, 248 Neb. 176, 532 N.W.2d 296 (1995).

In reviewing a criminal conviction, it is not the province of an appellate court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the trier of fact, and the verdict of the jury must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Marks*, 248 Neb. 592, 537 N.W.2d 339 (1995); *State v. Null*, 247 Neb. 192, 526 N.W.2d 220 (1995); *State v. Parks*, 245 Neb. 205, 511 N.W.2d 774 (1994).

## ANALYSIS

### EXPERT TESTIMONY

The admission of expert testimony is ordinarily within the discretion of the trial court, and its ruling will be upheld in the absence of an abuse of discretion. *State v. Dean*, 246 Neb. 869, 523 N.W.2d 681 (1994).

The helpfulness test subsumes a relevancy analysis. In making its determination, the court must proceed on a case–by–case basis. Its conclusions will depend on (1) the court's evaluation of the state of knowledge presently existing about the subject of the proposed expert testimony and (2) the court's appraisal of the facts of the case. *State v. Lowe*, 244 Neb. 173, 505 N.W.2d 662 (1993).

Under the helpfulness standard, a court may exclude an expert's opinion which is nothing more than an expression of how the trier of fact should decide a case, and when an expert's opinion on a disputed issue is a conclusion which may be deduced equally as well by a trier of fact with sufficient evidence on the issue, the expert's opinion is superfluous and does not assist the trier in understanding the evidence or determining a factual issue. *Id.*

There are four questions a court considers to determine the admissibility of expert testimony under Neb. Evid. R. 702, Neb. Rev. Stat. § 27–702 (Reissue 1989): (1) Does the witness

qualify as an expert pursuant to rule 702? (2) Is the expert's testimony relevant? (3) Will the expert's testimony assist the trier of fact to understand the evidence or to determine a controverted factual issue? (4) Should the expert's testimony, even though relevant and admissible, be excluded in light of Neb. Evid. R. 403, Neb. Rev. Stat. § 27–403 (Reissue 1989)? *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990).

A trial court's factual finding pursuant to Neb. Evid. R. 104(1), Neb. Rev. Stat. § 27–104(1) (Reissue 1989), concerning a determination whether a witness qualifies as an expert under rule 702 will be upheld on appeal unless clearly erroneous. *State v. Reynolds, supra.*

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. Rule 702.

The proposed expert claimed he had testified in only one other case involving crime scene reconstruction in another jurisdiction, but he was not sure of the jurisdiction and could not remember the name of the case. Prior testimony is not a prerequisite for expertise. He testified that he would not be able to determine what people were doing at the crime scene, but would probably be able to determine in some cases how they were positioned. He stated that he knew of no professional standards for those undertaking crime scene reconstruction. At the conclusion of the testimony attempting to qualify Deats as an expert, the court stated that the defense had not made clear what expertise Deats possessed in the field of crime scene reconstruction.

The testimony of the defense's expert was allowed up to a point. The court found that the defendant's proposed expert qualified as an expert in the fields of fingerprint analysis, toolmarking, and ballistics. As a result, he was qualified to and allowed to testify in those areas. The trial court was not clearly erroneous in finding that Deats was not an expert in the field of crime scene reconstruction. Without sufficient foundation establishing Deats as an expert in crime scene reconstruction, the trial court did not abuse its discretion in excluding the

proposed testimony in response to the State's foundation objection. See *Paulsen v. State, ante* p. 112, 541 N.W.2d 636 (1996).

## MOTION TO SUPPRESS

A trial court's ruling on a motion to suppress is to be upheld on appeal unless its findings of fact are clearly erroneous. *State v. Grimes*, 246 Neb. 473, 519 N.W.2d 507 (1994); *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994); *State v. Flores*, 245 Neb. 179, 512 N.W.2d 128 (1994); *State v. Ranson*, 245 Neb. 71, 511 N.W.2d 97 (1994).

In determining whether a trial court's findings on a motion to suppress are clearly erroneous, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Grimes, supra*; *State v. Dyer, supra*; *State v. Ranson, supra*.

In determining the correctness of a trial court's ruling on a suppression motion, an appellate court will accept the factual determinations and credibility choices made by the trial court unless, in light of all the circumstances, such findings are clearly erroneous. *State v. DeGroat*, 244 Neb. 764, 508 N.W.2d 861 (1993); *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993); *State v. Harris*, 244 Neb. 289, 505 N.W.2d 724 (1993).

The defendant claims that the trial court erred in denying her motion to suppress statements that she made to law enforcement and other persons at the scene of the crime and later in the morning to the police.

At the scene of the death, the defendant made pre– and post–*Miranda* statements to the officer who reported to a call about a shooting. As to the pre–*Miranda* statements, the defendant was clearly not in custody at that time. The officer had just arrived at the scene and was merely trying to investigate if there had been a shooting. General onscene questioning as to the facts surrounding a crime does not constitute a "custodial interrogation." See, *State v. Holman*, 221 Neb. 730, 380 N.W.2d 304 (1986); *State v. Mattan*, 207 Neb. 679, 300 N.W.2d 810 (1981).

As to the post-*Miranda* statements, those statements are required to be made voluntarily. The defendant argues that she was too intoxicated to make a voluntary statement. However, the defendant's statements at the time of the crime would indicate that she knew what was transpiring. She knew that the victim had been shot. She knew he was dead. She knew that she was probably a suspect. She repeatedly asked the police to just kill her then and there. The defendant also knew that she was having her children taken away. Finally, she refused to give the name of the victim. These facts demonstrate that the defendant was sufficiently able to comprehend and resist questions and that she gave voluntary answers. See *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983).

The next morning the defendant asked for a meeting with police. The defendant received and signed a *Miranda* warning waiver. The general rule is that an accused may waive his or her right to counsel where such waiver is made intelligently and understandingly, with knowledge of the right to counsel. *State v. Rogers*, 208 Neb. 464, 303 N.W.2d 788 (1981). In this case, the defendant wanted to talk, waited until the morning to ask for a meeting, and then waived her rights at the meeting she requested. The defendant then stated that she shot the victim.

There is no question that the State has the burden to establish by a preponderance of the evidence that a defendant's statement was voluntary and not coerced. *State v. Brewer*, 241 Neb. 24, 486 N.W.2d 477 (1992). In *State v. Haynie*, 239 Neb. 478, 490, 476 N.W.2d 905, 913 (1991), this court stated that "[c]oercive police conduct is a necessary predicate to the finding that a confession is not voluntary within the meaning of the due process clause of the 14th amendment." Whether a confession is voluntary is determined by considering all the circumstances. We find in this case that the totality of the circumstances shows initiation and the voluntary nature of the defendant's statements and that the interrogation did not violate the defendant's constitutional rights. It was not clearly erroneous to admit the statements of the defendant.

## Directed Verdict and Sufficiency

In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994); *State v. Hirsch*, 245 Neb. 31, 511 N.W.2d 69 (1994).

If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law. *State v. Hirsch, supra.*

In determining whether a criminal defendant's motion to dismiss for insufficient evidence should be sustained, the State is entitled to have all of its relevant evidence accepted as true, the benefit of every inference that can reasonably be drawn from the evidence, and every controverted fact resolved in its favor. *State v. McDowell*, 246 Neb. 692, 522 N.W.2d 738 (1994).

Testimony from the defendant's daughter related that the defendant told her to "find the bullets." Other witnesses testified to entering the bedroom after hearing a gunshot and to seeing the body of the victim and the defendant holding a gun. Law enforcement officials recited admission after admission from the defendant. The cause of death of the victim was a gunshot wound to the neck by the gun which the defendant held, and bullets for the gun were found in her closet. The defendant and the victim had been arguing earlier and at the time of the shooting.

The question of premeditation is for the jury. See *State v. Marks*, 248 Neb. 592, 537 N.W.2d 339 (1995). A directed verdict would have been improper. Construing the evidence in favor of the State, there was more than enough evidence for the jury to find premeditation and convict the defendant.

## Voir Dire

To make a prima facie case of purposeful discrimination in the selection of a jury based on the prosecutor's use of peremptory challenges, the defendant must show (1) that he is a member of a cognizable racial group, (2) that the prosecutor

has exercised peremptory challenges to remove from the panel members of the defendant's race, and (3) that facts and other circumstances raise an inference that the prosecutor used the challenges to exclude potential jurors based on their race. After the defendant has made a prima facie showing, the burden shifts to the State to provide a neutral explanation for challenging the jurors. *State v. Rowe*, 228 Neb. 663, 423 N.W.2d 782 (1988). See *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

If the trial court does not state on the record that the defendant has met the burden of proving a prima facie case, it does so implicitly by asking the State to articulate its reasons for the questioned strikes. *State v. Rowe, supra*.

A trial court's determination of the adequacy of the State's "neutral explanation" of its peremptory challenges will not be reversed upon appeal unless clearly erroneous. *State v. Morrow*, 237 Neb. 653, 467 N.W.2d 63 (1991).

The State's articulated neutral reason for the strike was that the defendant's attorney represented the struck juror's son in another matter less than 6 months before. This court has affirmed various neutral reasons presented by the prosecution. See *State v. Walton*, 227 Neb. 559, 418 N.W.2d 589 (1988) (juror struck because she was unemployed, single, lived at a particular address, and did not have community ties; juror struck because she was possibly related to an individual previously prosecuted by the prosecutor's office; juror struck because he was married to a social services worker, in connection with whom the trial judge expressed the view that people working in that field have a tendency to place blame on others, all found neutral). See, also, *State v. Alvarado*, 226 Neb. 195, 410 N.W.2d 118 (1987) (juror who was struck because she was young and defense witnesses were young and because of unavailability of a juror background questionnaire for her, found neutral); *State v. Threet*, 225 Neb. 682, 407 N.W.2d 766 (1987) (jurors struck because one knew about the case and her father had lived near the defendant and the other knew one of the potential witnesses, found neutral). We find that the reason articulated by the prosecution in this case is a sufficient neutral reason to avoid reversal on a "clearly erroneous" standard.

## CONCLUSION

Finding the assignments of error of the defendant to be without merit, we affirm.

AFFIRMED.