IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. COOK

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

LEANGELO COOK, APPELLANT.

Filed June 6, 2017.    No. A-15-1039.

Appeal from the District Court for Douglas County: TIMOTHY P. BURNS, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Leslie E. Cavanaugh for appellant.

Douglas J. Peterson, Attorney General, and, on brief, George R. Love for appellee.

INBODY, RIEDMANN, and ARTERBURN, Judges.

RIEDMANN, Judge.

## I. INTRODUCTION

Following a jury trial, Leangelo Cook was found guilty of possession of a deadly weapon by a prohibited person, possession of a defaced firearm, and tampering with a witness. After finding him to be a habitual criminal the district court for Douglas County sentenced him to 10 to 14 years' imprisonment on the possession counts and 12 to 16 years' imprisonment on the tampering count, to be served concurrently. Cook now appeals his convictions. Following our review of the record, we affirm.

## II. BACKGROUND

At approximately 2:48 a.m. on April 13, 2014, 911 dispatch received a call from a man named Jeremy who stated that he was being followed by a black SUV and the occupants of the SUV were waving a handgun at him. Jeremy reported that he was driving a green Ford Expedition

and was northbound on 24th Street. He then provided an update to dispatch that he was westbound at 30th Street and Ames and the SUV was still following him.

Dispatch broadcast this information to law enforcement officers as an armed moving disturbance. Several Omaha Police Department officers who were nearby reported to the area of 30th and Ames. The first officer to respond reported that approximately 45 seconds passed between the time that he heard the initial broadcast and the time when he first observed a black Chevy Tahoe matching the given description. Another responding officer testified that he and his partner observed the same SUV approximately one minute after the initial broadcast. All of the responding officers testified that traffic in that area was very light and they only saw one vehicle traveling westbound and that vehicle matched the description in the broadcast.

The first responding officer began to follow the black SUV as it traveled westbound on Ames. While following the SUV, the officer noticed that it had a very dark tint on the driver's side windows, which he believed to be an equipment violation. The SUV then turned left onto 38th Street and the officer followed. After driving approximately half a block, the officer observed the SUV pull over to the right shoulder without using its turn signal and come to a stop. The officer pulled up behind the SUV and activated his emergency lights.

A second cruiser stopped and the two officers inside made contact with the initial responding officer. At that point in time, the driver of the SUV rolled down his window, stuck out his head, and looked back at the three officers. One of the officers from the second cruiser recognized the driver as Leangelo Cook. He informed the other officers of Cook's identity and that he was a known gang member. Based on this information and the nature of the original broadcast, the officers decided to conduct a felony traffic stop.

The officers ordered the occupants out of the SUV one by one, starting with Cook, and placed them into handcuffs. In total there were four occupants: Cook, the front passenger, and two passengers in the back. After all four occupants had exited the vehicle, officers approached the SUV to ensure that there was no one else hiding inside. Upon approach, one officer noticed an open bottle of alcohol in plain view, sitting beneath the front passenger seat. The officer also noticed the odor of burnt marijuana emanating from inside the vehicle.

Officers then conducted a search of the vehicle. One officer who was familiar with Tahoe vehicles knew that the glove box could easily be removed and that there was an opening behind it where contraband could be hidden. Due to this knowledge, the officer removed the glove box in the Tahoe, where he found two firearms.

At approximately 2:52 a.m., the original 911 caller informed dispatch that the police officers had pulled over the wrong vehicle and that the suspect vehicle was still following him. Dispatch subsequently broadcast this information to officers. However, all three of the officers who responded to Cook's vehicle testified that they did not learn this information until after they had conducted the stop and detained the vehicle's occupants.

A crime lab technician recovered the two firearms from the Tahoe, a Manurhin Pistolet P1 handgun and a Glock 22C .40 caliber handgun. Upon examination, the technician found that there was a scratch covering the serial number on the Manurhin Pistolet, which was later depicted at trial in a photo in Exhibit 9. Despite the scratch, the technician attempted to read the serial number.

OPD ran a search on the serial number on the Glock firearm, which was not damaged, and it came back as registered to a particular person. OPD made contact with the owner, a friend and former girlfriend of Cook's, who stated that her firearm had been stolen over a year prior.

Cook, who had prior felony convictions, was subsequently charged with possession of a deadly weapon by a prohibited person and possession of a defaced firearm. He filed a motion to suppress, claiming that the initial stop of his vehicle as well as his detention and search of the vehicle violated his Fourth Amendment rights. After a hearing in March 2015, during which the district court heard testimony from three of the responding officers, Cook's motion was denied.

In April 2015, the State amended the information to charge Cook with witness tampering due to several communications that had been discovered between Cook and two women while he was incarcerated.

Cook's case proceeded to trial. During jury selection, the State exercised two of its peremptory strikes on two African-American prospective jurors. Cook raised a *Batson* challenge, alleging that the State's motivation in exercising its challenges was racial discrimination. The district court stated that it did not agree with Cook's articulation of the law, but said, "be that as it may, will the State state their reasons for the record why they struck Juror Number 11 and Juror Number 23."

The State, without conceding that Cook had "made a showing of any type of prejudice or discrimination . . . [b]ut in response to the court's instruction," explained that it struck juror No. 11 due to her short work history and because she seemed to "bounce around" and not have "a lot of roots with regards to Douglas County." The State explained that it struck juror No. 23 because she had made a comment that she was glad she did not have to serve on a previous jury, she was single, she appeared disinterested during voir dire, and she appeared to nod in agreement when another juror discussed his difficulty with sitting in judgment of other persons.

The district court overruled Cook's challenge, finding that he had not shown an inference of discrimination in the State's use of its peremptory challenges. Furthermore, the court found that even if Cook had shown an inference, the reasons articulated by the State were credible and race-neutral.

At trial, Cook's former girlfriend, the registered owner of the Glock firearm, testified that Cook had called her from jail soon after his arrest and asked her to write an affidavit stating that she and another person had been in the vehicle with the firearm. She testified that this would have been a lie and she never wrote any such affidavit. OPD checked Cook's jail phone records and confirmed that he had made calls to this friend several days after his arrest.

Cook's girlfriend, Porcha Busch, testified that she was the owner of the Chevy Tahoe. She said that Cook called her from jail after his arrest and they discussed that she could sign an affidavit claiming ownership of the firearms, even though this was not true. Busch admitted that even though the firearms were not hers, she did sign an affidavit stating that she had put them in the vehicle and that Cook had no knowledge of them.

The State offered Exhibit 6 into evidence, which was a letter that Cook wrote to a "Porcha C." while he was in jail. In the letter, Cook wrote, "that affidavit gotta say [something] like this babe," and included sample language for an affidavit stating that Busch had placed the firearms behind the glove box and that neither Cook nor the front passenger had any knowledge of them.

The jury subsequently found Cook guilty on all three counts. The district court found that he was a habitual criminal and sentenced him to 10 to 14 years' imprisonment on the possession of a deadly weapon count, 10 to 14 years on the defaced firearm count, and 12 to 16 years on the witness tampering count. The court ordered the sentences to be served concurrently and gave Cook credit for 570 days. Cook now appeals his convictions.

## III. ASSIGNMENTS OF ERROR

Cook assigns, restated, that the district court erred in (1) overruling his motion to suppress; (2) finding that the State's reasons for striking two African-American prospective jurors were race-neutral; and (3) overruling his motion for a directed verdict.

## IV. STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Rocha*, 205 Neb. 716, 890 N.W.2d 178 (2017). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id.* The ultimate determination of probable cause to perform a warrantless search is reviewed de novo and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *Id.*

An appellate court reviews de novo the facial validity of an attorney's race-neutral explanation for using a peremptory challenge as a question of law. *State v. Clifton*, 296 Neb. 135, 892 N.W.2d 112 (2017). It reviews for clear error a trial court's factual determination regarding whether a prosecutor's race-neutral explanation is persuasive and whether the prosecutor's use of a peremptory challenge was purposefully discriminatory. *Id.*

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. *State v. Duncan*, 293 Neb. 359, 878 N.W.2d 363 (2016). Such matters are for the finder of fact. *Id.* The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011).

## V. ANALYSIS

### 1. MOTION TO SUPPRESS

Cook claims that the district court erred in overruling his motion to suppress because police officers had no probable cause to initiate a felony traffic stop, pat him down, detain him, and search the vehicle. He argues that there was nothing to indicate that his vehicle was the SUV reported in the 911 call and that officers ignored additional information from dispatch informing them that they had stopped the wrong vehicle. Cook further argues that officers had no reasonable suspicion

to believe that he was armed and therefore were not justified in detaining him and conducting a search of the vehicle.

The Fourth Amendment of the United States Constitution and article I, §7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. *State v. Rodriguez*, 288 Neb. 878, 852 N.W.2d 705 (2014). This guarantee mandates that an arrest be based upon probable cause and limits investigatory stops to those made upon an articulable suspicion of criminal activity. *Id.* A vehicle stop requires only reasonable suspicion, based on specific and articulable facts, that a person has committed or is committing a crime. *State v. Bol*, 288 Neb. 144, 846 N.W.2d 241 (2014). Such a determination of reasonable suspicion is made based upon the totality of the circumstances. *Id.* However, it is also well established that a traffic violation, no matter how minor, creates probable cause to stop a vehicle. *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008).

The Nebraska Supreme Court has held that the factual basis for a traffic stop need not arise from an officer's personal observation, but rather may be supplied by information acquired from another person as long as the information contains sufficient indicia of reliability. *State v. Rodriguez, supra*. Specifically, the court held that a citizen informant who has personally observed the commission of a crime is considered presumptively reliable. *State v. Detweiler*, 249 Neb. 485, 544 N.W.2d 83 (1996). In determining the reliability of an informant's information, the court has distinguished between a citizen informant "whose only motive is to help law officers in the suppression of crime" and an ordinary police tipster "who acts for money, leniency, or some other selfish purpose." *Id*.

Here, a 911 caller who identified himself as "Jeremy" reported that he was being followed by a black SUV whose occupants had waved a handgun at him. Jeremy provided his location to dispatch, who in turn broadcast the suspect vehicle's description, location, and direction of travel to law enforcement officers. Based on his eyewitness observations and his desire for police intervention, Jeremy would be considered a citizen informant rather than an ordinary police tipster. As such, his report was presumptively reliable and gave rise to reasonable suspicion to conduct a traffic stop.

Within minutes of the broadcast from dispatch, several officers responded to the area where the suspect vehicle was last reported. All three responding officers testified that they saw only one vehicle that matched the description of the suspect vehicle and was traveling in the same direction reported by dispatch, later identified as Cook's vehicle.

While the first responding officer was following Cook's vehicle, he noted that its windows were tinted very dark. After Cook made a left turn onto 38th Street, the officer observed Cook pull off to the side of the street without using his turn signal. Both of these constituted independent traffic violations. Once Cook's vehicle was stopped, the officer stopped his vehicle behind Cook's and activated his emergency lights.

Based upon the first responding officer having personally observed two traffic violations, Cook's unlawfully tinted windows and his failure to use his turn signal, he had reasonable suspicion to conduct an investigatory stop. No matter how minor a traffic violation is, such offense creates probable cause for an officer to stop the offending vehicle. *State v. Draganescu, supra*. After officers initiated the stop but before making contact with Cook, one officer recognized Cook as a known and dangerous gang member. Based on this information as well as the initial report

that the occupants of the suspect vehicle were armed, officers decided to conduct a felony traffic stop. The reason for such a stop was officer safety because they believed one or more occupants of the vehicle may have had a firearm.

A felony traffic stop is not clearly defined by Nebraska case law. However, one officer testified that such a stop is generally conducted by telling the driver to turn the vehicle off and drop the keys out the window. Officers then order the occupants out with their hands up, facing away, and the occupants are then told to walk backwards towards the officers before being placed into handcuffs. During the course of such a stop, officers have their firearms drawn. Cook cites to *U.S. v. Melendez-Garcia*, 28 F.3d 1046 (8th Cir. 1994), which discusses the circumstances under which law enforcement officers' use of handcuffs and firearms is justified. There, the court held that such use of force requires facts showing that officers reasonably believed such actions were warranted. *Id*. The Eighth Circuit found that the use of handcuffs and guns pursuant to an investigative stop was not justified in the absence of evidence that officers had reason to believe the suspects were armed or violent. *Id*.

Here, officers were operating under the belief that they had stopped the suspect vehicle from the initial 911 call, whose occupants were reported to be armed. Furthermore, one officer recognized Cook as a known and dangerous gang member. These two pieces of information, based on specific and articulable facts, gave rise to the reasonable belief that Cook was armed. In order to ensure their own safety, officers were justified in conducting a "felony traffic stop," which included a greater level of intrusiveness than an investigatory stop.

Subsequent to the lawful stop of a vehicle, officers may order the driver to step out of the vehicle. *State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012). The United States Supreme Court has held that officers may also order passengers out of a vehicle during a lawful traffic stop. *Maryland v. Wilson*, 519 U.S. 408, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997). Officers are permitted to pat down a vehicle's occupant if they have reasonable suspicion that the person is armed and dangerous. *State v. Nolan, supra*. Additionally, the reasonable belief, based on specific and articulable facts taken together with rational inferences from such facts, that a suspect is armed and dangerous permits officers to search the passenger compartment of a vehicle in areas in which a weapon may be placed or hidden. *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983). Such a search is justified by the need to protect officers when they reasonably believe a suspect poses danger and the acknowledgement that "roadside encounters between police and suspects are especially hazardous." *Id*.

In the case at bar, the recognition of Cook as a known and dangerous gang member coupled with the initial report that occupants of the suspect vehicle had been waving a handgun gave rise to the reasonable belief that Cook may be armed and thus may be a danger to officers' safety. Based on this reasonable belief, the officers lawfully ordered Cook and the passengers out of the vehicle, patted Cook down for any weapons on his person, and placed him in handcuffs. Officers then commenced a search of the passenger compartment for any weapons, at which time they located two firearms behind the glove box. We also note that as officers approached the vehicle but prior to commencing the search, one officer smelled the odor of burnt marijuana emanating from inside the vehicle. The Nebraska Supreme Court has held that such an observation provided sufficient probable cause for officers to search the vehicle. *State v. Watts*, 209 Neb. 371, 307 N.W.2d 816 (1981).

Cook argues that the officers involved in the stop and search of his vehicle willfully ignored information from dispatch informing them that they had stopped the wrong vehicle. However, the testimony of each of the officers refutes this point. While the State does not contest that the 911 caller informed dispatch and dispatch in turn sent out a broadcast stating that they had stopped the wrong vehicle, all of the officers involved in the stop testified that they did not receive such information until after they had already stopped the vehicle and detained its occupants. In determining the correctness of a trial court's ruling on a suppression motion, an appellate court will accept the credibility choices made by the trial court unless such findings are clearly erroneous. *State v. Lopez*, 249 Neb. 634, 544 N.W.2d 845 (1996). Therefore, we find that at the time the officers conducted the stop, they were operating under the reasonable belief that Cook's vehicle was the black SUV with armed occupants that was reported in the 911 call.

On the facts of this case, we find that it was reasonable for officers to believe that Cook was armed and dangerous and it was therefore lawful to conduct a felony stop/arrest. Consequently, the district court properly denied the motion to suppress.

### 2. *BATSON* CHALLENGE

Cook argues that the district court erred in finding that the State's reasons for striking two African-American prospective jurors were race-neutral. Cook, who is African-American, claims that the State improperly struck prospective jurors Nos. 11 and 23 based on their race. Furthermore, he alleges that the State's reasons for striking them were not race-neutral because other similarly-situated non-African-Americans were not struck from the venire. We disagree.

A prosecutor is generally entitled to exercise his or her peremptory challenges for any reason at all so long as such reason is related to the prosecutor's view regarding the outcome of the case. *State v. Clifton, supra*. However, the United States Supreme Court held in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), that the Equal Protection Clause forbids prosecutors from striking jurors solely based on their race. *Id.*

The determination of whether a prosecutor struck a prospective juror based on race is a three-step process. *Id.* First, a defendant must make a prima facie showing that the prosecutor exercised a peremptory challenge because of race. *Id.* Second, assuming that the defendant has made such a showing, the prosecutor must offer a race-neutral reason for striking the juror. *Id.* Third, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination. *Id.* The ultimate burden of persuasion to show racial motivation rests with, and never shifts from, the opponent of the strike. *Id.*

After a trial court has determined the ultimate question of intentional racial discrimination, the question on appeal is only whether the prosecutor's reasons were facially race-neutral and whether the trial court's final determination as to racial discrimination was clearly erroneous. *Id.* The Nebraska Supreme Court has noted that the best evidence of discriminatory intent often will be the demeanor of the attorney who exercised the challenge. *Id.* Such a determination of credibility lies within the province of a trial judge and, absent exceptional circumstances, requires deference to the trial court. *Id.*

Here, the State struck two African-American prospective jurors, Nos. 11 and 23. In arguing his *Batson* challenge to the district court, Cook stated that any time the State strikes someone from the defendant's same racial group, it is up to that party to provide a reason for such strike. The

district court responded that it did not agree with Cook's articulation of the law; rather, in a case with an African-American defendant, the fact that the State has struck an African-American juror does not automatically raise an inference of discrimination. The court continued, "be that as it may, will the State state their reasons for the record why they struck Juror Number 11 and Juror Number 23."

The State, without conceding that Cook had made any showing of discrimination, articulated that it had struck prospective juror No. 11 due to the fact that she "seem[ed] to bounce around quite -- a little, doesn't have a lot of roots with regards to Douglas County." The State said that it struck prospective juror No. 23 because she made a comment that she was happy she did not have to serve on a previous jury, she was single, she appeared disinterested during voir dire, and she appeared to nod her head as if to agree while another juror discussed his difficulty with judging other persons.

In making its determination as to whether the State engaged in purposeful discrimination, the district court noted that five of the 24 members of the venire were African-American, as was one of the three alternates. The State struck two African-Americans, leaving three on the jury, and neither party struck the African-American alternate. The court then found that Cook had not shown an inference of discrimination in the State's use of peremptory challenges, and even if Cook had done so, the reasons articulated by the State were credible and race-neutral.

The State argues that Cook failed to make a prima facie showing that it had struck the two jurors based on their race. Cook claims that even though the court did not state on the record that it found that he had met his initial burden, it did so implicitly by asking the State to articulate its reasons for its strikes. See *State v. Rowe*, 228 Neb. 663, 423 N.W.2d 782 (1988). However, we need not decide this issue because even assuming that Cook did make a prima facie showing of racial discrimination, we determine that the State's reasons for the strikes were race-neutral. See *State v. Nave*, 284 Neb. 477, 821 N.W.2d 723 (2012)(initial question whether prosecutor's reasons were race neutral is question of law appellate court reviews de novo).

Cook claims that the explanation given for striking prospective juror No. 11 was not plausible because other non-African-American jurors who also had short and varied work history were not struck. During voir dire, prospective juror No. 11 said that she had only been at her current job for two months and that she had been at her previous job for nine months. Before that, she worked at a different job "on and off for about three years." She also stated that approximately two years ago, she had lived in Louisiana for seven months. In comparison, Cook points to another prospective juror who had only been at her current job for six months. However, there was no indication how long that juror had been at her previous job nor was there any indication that she had resided out of state in the past several years. Furthermore, a strict comparison analysis may not properly take into account the variety of factors and considerations that affect an attorney's decision to select certain jurors while choosing to challenge others. *State v. Clifton, supra.* Juror No. 11 stated that she had had three different jobs in the past three years and had lived out of state fairly recently, albeit for a brief period of time. We find these factors distinguish juror No. 11 from other jurors who had only been employed at their current job for several months.

Regarding prospective juror No. 23, Cook argues that despite her statement that she was glad to be excused from a prior prospective jury panel, there was no indication that she did not want to serve on this panel. Additionally, he claims that race was a motivating factor because the

State cited that part of its reasoning for striking her was because she was single but there were other non-African-Americans who were single and were not struck.

While juror No. 23's single status was one factor that the State relied upon in its decision to challenge her, it was not the only factor. This juror indicated that she was happy to not have had to serve on a previous panel and appeared to be disinterested during voir dire of the present panel. She also appeared to nod in agreement with the statements of another prospective juror who said that he would have difficulty sitting in judgment of another person. Because it is a juror's job to determine and judge the facts of a case, we find that it is reasonable for any party to challenge jurors who express such reservations. This apparent reluctance to judge other persons in combination with juror No. 23's feelings regarding past jury service and her disinterest during voir dire distinguish her from other single jurors who were not challenged.

Based on our examination of the record, we conclude that the district court did not clearly err in finding the State's race-neutral explanations for striking jurors Nos. 11 and 23 persuasive and therefore finding the State's use of peremptory challenges was not purposefully discriminatory.

### 3. MOTION FOR DIRECTED VERDICT

Cook claims that the State presented insufficient evidence to support his conviction on each of the three charges. He argues that in the absence of such evidence, the district court erred in overruling his motion for a directed verdict. We disagree.

#### (a) Possession of Deadly Weapon by Prohibited Person

Cook was charged in count I with possession of a deadly weapon by a prohibited person under Neb. Rev. Stat. § 28-1206(1)(a) (Reissue 2016), which provides, in relevant part, that "[a]ny person who possesses a firearm . . . and who has previously been convicted of a felony . . . commits the offense of possession of a deadly weapon by a prohibited person."

The State presented evidence that two firearms were located inside the vehicle that Cook was driving. Pursuant to Neb. Rev. Stat. § 28-1212 (Reissue 2016), the presence of any firearm in a motor vehicle other than a public vehicle shall be prima facie evidence that the firearm is in possession of and is carried by all persons occupying such motor vehicle at the time it is found. Prima facie evidence constitutes evidence sufficient to submit an issue to the fact finder for disposition and precludes a directed verdict against the party with the burden of proof. *State v. Jasper*, 237 Neb. 754, 467 N.W.2d 855 (1991). Furthermore, the parties stipulated that Cook was a prohibited person due to his prior felony convictions.

Viewing the evidence in the light most favorable to the prosecution, the State presented prima facie evidence that Cook had committed the offense of possession of a deadly weapon by a prohibited person and the issue was properly submitted to the jury.

#### (b) Possession of Defaced Firearm

Count II charged Cook with possession of a defaced firearm pursuant to Neb. Rev. Stat. § 28-1207 (Reissue 2016), which provides, in relevant part, "[a]ny person who knowingly possesses . . . any firearm from which the manufacturer's identification mark or serial number has

been removed, defaced, altered, or destroyed, commits the offense of possession of a defaced firearm."

The State presented evidence from Kristen Smith, the crime lab technician who recovered the two firearms from the vehicle, that the serial number on the Manurhin Pistolet P1 firearm had been damaged. Smith testified that it appeared that someone had attempted to deface or damage the serial number to make it more difficult to read. The State submitted Exhibit 9, a photograph of the Pistolet firearm, which depicted a scratch mark on the area where the serial number was found.

Cook argues that despite Smith's testimony that there was a scratch on the serial number, she could still read the number. However, this argument is misdirected. To constitute a defaced firearm, it is not necessary for the manufacturer's identification mark or serial number to be completely obliterated; rather, the statute refers to any firearm from which such mark or number "has been removed, defaced, altered, or destroyed." Neb. Rev. Stat. § 28-1207. Therefore, it is sufficient that a firearm's serial number has been defaced or altered, and such number or mark need not be completely eradicated. Here, it is clear from the photo in Exhibit 9 that there is a large scratch mark covering the firearm's serial number. Whether or not a crime lab technician could still discern what the serial number was is irrelevant.

Based on Smith's testimony and Exhibit 9, in conjunction with the statutory presumption of § 28-1212, the State presented a prima facie case with regard to this charge and it was properly submitted to the jury.

(c) Tampering With Witness

Cook was charged in count III with tampering with a witness in violation of Neb. Rev. Stat. §28-919(1) (Reissue 2016), which provides, in relevant part, "[a] person commits the offense of tampering with a witness or informant if, believing that an official proceeding or investigation of a criminal or civil matter is pending or about to be instituted, he or she attempts to induce or otherwise cause a witness or informant to . . . testify or inform falsely."

The State called two witnesses with whom Cook had allegedly tampered. The first was Cook's girlfriend, Busch, who owned the vehicle he was driving when he was stopped. Busch testified that when Cook called her from jail, they discussed that she could write an affidavit saying that the guns were hers, even though this would have been a lie. She also testified that someone came to her job and had her sign an affidavit which stated that she had put the firearms in her vehicle and that Cook had no knowledge of them. Despite the fact that this was not true, Busch signed the affidavit.

The prosecution entered into evidence Exhibit 6, which was a copy of a letter that Cook sent to "Porcha C." while he was in custody. In the letter, Cook wrote, "that affidavit gotta say [something] like this babe," and included the following language as a sample:

> I Porcha Busch own the 97 black Tahoe that LeAngelo Cook Sr. and Shannon Watkins were in. The firearms that were found in my tahoe I place [sic] behind the Glove box were put there by me[.] [T]hey had No knowledge of them being there and I let them use my vehicle on 04/12/2014 and forgot they were there when I let them use my vehicle.

Busch testified that the firearms were not hers nor was she aware that they were in her vehicle. She further testified that she had never removed or looked behind her glove box, nor did she know how to do so.

The second witness was Cook's friend and former girlfriend. This witness was the registered owner of the Glock firearm found in the vehicle. She testified that Cook called her from jail after his arrest and asked her to write an affidavit stating that she and another person had been in the vehicle with her firearm. She testified that this would have been a lie, as her firearm had been stolen over a year prior to this incident, and she did not sign any such affidavit. The State also submitted a copy of Cook's phone records while he was in jail, which confirmed that he had called this friend several times on April 18, 2014.

Cook argues that Busch never received the letter that he sent while he was in jail. Furthermore, he argues that because both women appeared and testified in court, there was no evidence that he had "thwarted" their appearance as witnesses. However, this argument is misplaced. Section 28-919(1) does not require that a witness or informant testify or inform falsely; rather, it requires only that a person "*attempts to induce or otherwise cause*" a person to do. Neb. Rev. Stat. § 28-919(1) (emphasis supplied). Therefore, it is sufficient that Cook attempted to persuade the witnesses to falsely fill out affidavits claiming ownership of the firearms.

In reviewing the sufficiency of the evidence, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. *State v. Duncan, supra*. Such matters are for the finders of fact. *Id.* Here, we determine that the State presented evidence that Cook called two witnesses and asked them to falsely sign affidavits claiming ownership of the firearms and claiming that they had put them in the vehicle without his knowledge. The State also presented evidence that Cook sent a letter to Busch in which he provided specific language that she should include in her affidavit. Both witnesses subsequently testified that they did not place the firearms in the vehicle nor did they have any knowledge of their presence there. Based on this evidence, we find that the State presented sufficient evidence to submit this issue to the jury, and therefore the district court did not err in overruling Cook's motion for a directed verdict.

## VI. CONCLUSION

Following our review of the record, we find Cook's assignments of error to be without merit and therefore affirm.

AFFIRMED.